THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* CLARENCE A. CRANE, Respondent.

Labor Law — provision that only citizens shall be employed upon public works does not violate any constitutional right of aliens — provision not in conflict with treaties between the United States and foreign nations.

1. The principle that justifies discrimination by the state between citizens and aliens in the distribution of its own resources is that the common property of the state belongs to the people of the state, and hence that, in any distribution of that property, the citizen may be preferred, since whatever is a privilege rather than a right may be made dependent upon citizenship.

2. The defendant contracted with the city of New York to construct certain sewer basins. In doing the work he employed laborers not citizens of the United States, one of whom was an Italian. Because of the employment of aliens he has been convicted of violating section 14 of the Labor Law (L. 1909, ch. 36, Cons. Laws, ch. 31), which provides that in the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, only citizens of the United States shall be employed, and fixes a penalty for its violation. *Held*, that in thus preferring its own citizens the statute does not violate any

constitutional right of the alien. (U. S. Const. 14th Amend.; N. Y. Const. art. 1, § 6; art. 8, §§ 9, 10.) There is no distinction between the right of government to exclude aliens from its own employment and the right to exclude aliens from employment by independent contractors. (*People* v. *Orange County Road Construction Co.*, 175 N. Y. 84, distinguished.) Nor is the statute invalid as in conflict with the treaty between the United States and Italy.

3. A statute must be obeyed unless it is in conflict with some command of the Constitution, either of the state or of the nation. It is not enough that it may seem to be impolitic or even oppressive. If doubt exists whether there is a conflict between the statute and the Constitution, the statute must prevail.

*People* v. *Crane*, 165 App. Div. 449, reversed.

(Argued January 25, 1915; decided February 25, 1915.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered December 31, 1914, reversing a judgment of the Court of Special Sessions of the city of New York convicting the defendant of a violation of section 14 of the Labor Law.

The facts, so far as material, are stated in the opinion.

*Charles A. Perkins, District Attorney* (*Robert S. Johnstone* and *George Z. Medalie* of counsel), for appellant. The individual as an employer of labor and the state as an employer of labor stand on the same footing. (*People* v. *Orange County R. C. Co.*, 175 N. Y. 84, 89, 90; *People* v. *Luddington*, 74 Misc. Rep. 363.) The state for itself and for each of its separate governmental agencies has the right to declare that, with respect to works of a public nature done by contract, the person contracting to do that work shall only employ such persons as the state may direct, and to place a restriction, if it sees fit to do so, upon the classes of persons who may be employed by the contractor. (*People* v. *Luddington*, 74 Misc. Rep. 363; *Atkin* v. *Kansas*, 191 U. S. 207; *Ryan* v. *City of New York*, 177 N. Y. 271; *People ex rel. W. E. & C. Co.* v. *Metz*, 193 N. Y. 148; *Patsone* v.

*Pennsylvania,* 232 U. S. 138.) With reference to a municipality, statutory regulations may be regarded as upon the same footing as they would be where the state itself is concerned. (*Atkin* v. *Kansas,* 191 U. S. 207; *Ryan* v. *City of New York,* 177 N. Y. 271; *People ex rel. Rodgers* v. *Coler,* 166 N. Y. 1; *People ex rel. W. E. & C. Co.* v. *Metz,* 193 N.Y. 148; *Hunter* v. *Pittsburgh,* 207 U. S. 161; *People* v. *Morris,* 13 Wend. 325; *Darlington* v. *Mayor,* 31 N. Y. 164; *Demarest* v. *Mayor,* 74 N. Y. 161, 167; *Mount Pleasant* v. *Beckwith,* 100 U. S. 514; Cooley on Const. Lim. [7th ed.] 266; *People* v. *Pinckney,* 32 N. Y. 377.) The legislature has the right, by virtue of the police power, vested in the state as the sovereign, to pass laws in furtherance of the general welfare of its citizens. This power permits of any legislation that will insure to the citizens of the state employment, particularly in periods of distress. (*People* v. *Ewer,* 141 N. Y. 129; *Bloomfield* v. *State,* 86 Ohio St. 253; *People ex rel. Nechamcus* v. *Warden,* 144 N. Y. 529; *Noble St. Bank* v. *Haskell,* 219 U. S. 104; *Matter of Jacobs,* 98 N. Y. 98; *People* v. *West,* 106 N. Y. 293; *Bohmer* v. *Haffen,* 161 N. Y. 390; *Lochner* v. *New York,* 198 U. S. 45; *Lemieux* v. *Young,* 211 U. S. 489; *People ex rel. W. E. & C. Co.* v. *Metz,* 193 N. Y. 148.) There is no invalid classification. (*Comm.* v. *Hana,* 195 Mass. 262; *Patsone* v. *Pennsylvania,* 232 U. S. 138; *Geer* v. *Connecticut,* 161 U. S. 519; *McCready* v. *Virginia,* 94 U. S. 391; *Drew* v. *Rogers,* 34 Pac. Rep. 1081; *State* v. *Van Beck,* 54 N.W. Rep. 525; *Opinion of Justices,* 122 Mass. 594; *Scott* v. *Stroback,* 49 Ala. 477; *Kohl* v. *Lehlback,* 160 U. S. 293; *Comm.* v. *Patsone,* 231 Penn. St. 46; *State* v. *Travelers Ins. Co.,* 70 Conn. 590.) The provision of the statute under consideration is not in conflict with the treaty contracted between the United States government and Italy — or the treaties between the United States government and other foreign nations. (*United States* v. *Cruikshank,* 92 U. S. 542; *Chisholm* v. *Georgia,* 2 Dall. 419; *Geofroy* v. *Riggs,* 133

U. S. 258; *Provost* v. *Greneaux,* 19 How. Pr. 7; *Jones* v. *Meehan,* 175 U. S. 1; *Chirac* v. *Chirac,* 2 Wheat. 259; *Blythe* v. *Hinckley,* 180 U. S. 333; *United States* v. *Rauscher,* 119 U. S. 407; *Head Money Cases,* 112 U. S. 580.) The statute in question in the case at bar does not discriminate against any particular nationality, and, therefore, does not conflict with any treaty or with the Fourteenth Amendment. (*Comm.* v. *Patsone,* 231 Penn. St. 46; *Patsone* v. *Pennsylvania,* 232 U. S. 138.)

*Edward M. Grout* and *James F. McKinney* for respondent. Section 14 of the Labor Law is void because it contravenes sections 1 and 6 of article I of the Constitution of the state of New York, that "no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers," and that "no person shall be * * * deprived of life, liberty or property without due process of law * * *." (*People* v. *Warren,* 13 Misc. Rep. 615; *People ex rel. Rodgers* v. *Coler,* 166 N. Y. 1; *Myers* v. *City of New York,* 58 App. Div. 534; *Ryan* v. *City of New York,* 177 N.Y. 271; *People* v. *Budd,* 117 N. Y. 1; *People ex rel. W. E. & C. Co.* v. *Metz,* 193 N. Y. 148; *Colon* v. *Lisk,* 153 N. Y. 188.) Section 14 of the Labor Law is void because it contravenes provisions of the Constitution of the United States that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states" (Art. 4, § 2); "No person shall * * * be deprived of life, liberty or property without due process of law * * *" (5th Amend.); "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws" (14th Amend. § 1). It is also void because it contravenes the

provisions of various treaties existing with foreign nations, which treaties pursuant to subdivision 2 of article 6 of the United States Constitution, providing that "this constitution and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding," are paramount to the right of our legislature to enact legislation discriminating against aliens in favor of citizens of the state. (*Yick Wo* v. *Hopkins*, 118 U. S. 356; *Barbier* v. *Connolly*, 113 U. S. 27; *Henderson* v. *Wickham*, 92 U. S. 259; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Chy Lung* v. *Freeman*, 92 U. S. 275; *Connolly* v. *Union S. P. Co.*, 184 U. S. 539; *Lochner* v. *People*, 198 U. S. 45; *Colon* v. *Lisk*, 153 N. Y. 188; *People ex rel. Tyroler* v. *Warden*, 157 N. Y. 116; *Wynehamer* v. *People*, 13 N. Y. 378.) The contract agreement to comply with the law falls with the law itself. (*People ex rel. Rodgers* v. *Coler*, 166 N. Y. 1; *Knowles* v. *City of N. Y.*, 176 N. Y. 430; *People ex rel. Cossey* v. *Grout*, 179 N. Y. 417; *Home Ins. Co.* v. *Morse*, 20 Wall. 445.)

CARDOZO, J. The defendant is a contractor with the city of New York. His contract was for the construction of sewer basins. In doing the work, he employed laborers not citizens of the United States. One of them was an Italian. The nationality of the others is not shown. Because of the employment of these aliens, he has been convicted of violating section 14 of the Labor Law (L. 1909, ch. 36, Cons. Laws, ch. 31). The section reads as follows:

"Section 14. Preference in employment of persons upon public works. In the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, only citizens of the

United States shall be employed; and in all cases where laborers are employed on any such public works, preference shall be given citizens of the state of New York. In each contract for the construction of public works a provision shall be inserted, to the effect that, if the provi-sions of this section are not complied with, the contract shall be void. All boards, officers, agents or employees of cities of the first class of the state, having the power to enter into contracts which provide for the expenditure of public money on public works, shall file in the office of the commissioner of labor the names and addresses of all contractors holding contracts with said cities of the state. Upon the letting of new contracts the names and addresses of such new contractors shall likewise be filed. Upon the demand of the commissioner of labor a con-tractor shall furnish a list of the names and addresses of all subcontractors in his employ. Each contractor per-forming work for any city of the first class shall keep a list of his employees, in which it shall be set forth whether they are naturalized or native born citizens of the United States, together with, in case of naturalization, the date of naturalization and the name of the court where such naturalization was granted. Such lists and records shall be open to the inspection of the commissioner of labor. A violation of this section shall constitute a mis-demeanor and shall be punishable by a fine of not less than fifty dollars nor more than five hundred dollars, or by imprisonment for not less than thirty nor more than ninety days, or by both such fine and imprisonment."

The Appellate Division has held that this statute vio-lates both the state and the federal constitution. Its effect, we are told, is to deprive the excluded aliens of their liberty without due process of law, in that they are denied the right to labor on the public works. (Federal Const. 14th Amendment; State Const. art. 1, sec. 6.) The effect also is, we are told, to deny to the excluded aliens the equal protection of the laws. (Federal Const. 14th Amend-

ment.) It is true the defendant is not within the excluded classes. (*Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, 545.) He is charged, however, with a crime, and the crime is said to have been the refusal to discriminate, and nothing else. The laborers whom he has employed *are* within the excluded classes; and if they had a right to serve, he on his side had a right to employ. To refuse to give effect to an unlawful discrimination, and to do this at the instance of those against whom the discrimination is aimed, cannot constitute a crime. The question whether this statute does discriminate against aliens in violation of the constitution is, therefore, we think, before us.

The moneys of the state belong to the people of the state. They do not belong to aliens. The state, through its legislature, has given notice to its agents, that in building its public works, it wishes its own moneys to be paid to its own citizens, and if not to them, then, at least, to citizens of the United States. The argument is made that in thus preferring its own citizens in the distribution of its own wealth, it denies to the alien within its borders the equal protection of the laws.

The people, viewed as an organized unit, constitute the state. (*Penhallow* v. *Doane's Adm.,* 3 Dallas, 54, 100; *Texas* v. *White,* 7 Wall. 700, 720.) The members of the state are its citizens. (*United States* v. *Cruikshank,* 92 U. S. 542, 549; *Minor* v. *Happersett,* 21 Wall. 162.) Those who are not citizens, are not members of the state. Society thus organized, is conceived of as a body corporate. Like any other body corporate, it may enter into contracts, and hold and dispose of property. In doing this, it acts through agencies of government. These agencies, when contracting for the state, or expending the state's moneys, are trustees for the people of the state. (*Illinois* v. *Illinois Central R. R. Co.,* 146 U. S. 387.) It is the people, *i. e.,* the members of the state, who are contracting or expending their own moneys through agencies of their

own creation. Certain limitations on the powers of those agencies result from the nature of the trust. (*Illinois* v. *Illinois Central R. R. Co.*, *supra.*) Since government, in expending public moneys, is expending the moneys of its citizens, it may not by arbitrary discriminations having no relation to the public welfare, foster the employment of one class of its citizens and discourage the employment of others. It is not fettered, of course, by any rule of absolute equality; the public welfare may at times be bound up with the welfare of a class; but public welfare, in a large sense, must, none the less, be the end in view. Every citizen has a like interest in the application of the public wealth to the common good, and the like right to demand that there be nothing of partiality, nothing of merely selfish favoritism, in the administration of the trust. But an alien has no such interest, and hence results a difference in the measure of his right. To disqualify citizens from employment on the public works is not only discrimination, but arbitrary discrimination. To disqualify aliens is discrimination indeed, but not arbitrary discrimination, for the principle of exclusion is the restriction of the resources of the state to the advancement and profit of the members of the state. Ungenerous and unwise such discrimination may be. It is not for that reason unlawful.

The power of a state to discriminate between citizens and aliens in the distribution of its own resources is sanctioned alike by decisions of the courts and by long-continued practice. Neither aliens nor the citizens of other states are invested by the constitution with any interest in the common property of the people of this state. (*McCready* v. *Virginia*, 94 U. S. 391, 394.) It has been held, therefore, that a state may deny to aliens, and even to citizens of another state, the right to plant oysters or to fish in public waters. (*McCready* v. *Virginia*, *supra* ; *People* v. *Lowndes*, 130 N. Y. 455, 462; *Commonwealth* v. *Hilton*, 174 Mass. 29.) It may restrict to its own citi-

11

zens the enjoyment of its game. (*Geer* v. *Connecticut,* 161 U. S. 519, 529; *Patsone* v. *Pennsylvania,* 232 U. S. 138, 145.) It may discriminate between citizens and aliens in its charitable institutions, or in other measures for the relief of paupers. (Freund on the Police Power, sec. 712; State Charities Law [L. 1909, chap. 57], sec. 17.) It may make the same discrimination in the distribution of its public lands (*McCready* v. *Virginia, supra*); its mines (*Justice Mining Co.* v. *Lee,* 21 Colo. 260); its forests; or other natural resources. It may deny to aliens the right to hold or inherit real estate, except where the right has been secured by treaty. (*Blythe* v. *Hinckley,* 180 U. S. 333, 341.) The origin of this last disability is historical (1 Pollock & Maitland History of English Law, 445), but the policy underlying it is akin to the policy that underlies the others. The principle that justifies these discriminations is that the common property of the state belongs to the people of the state, and hence that, in any distribution of that property, the citizen may be preferred.

To defeat this law it must, therefore, be held that the constitution gives to the state a narrower liberty of choice in the expenditure of its own moneys than in the use or distribution of its other resources. I can find no justification for the supposed distinction. The construction of public works involves the expenditure of public moneys. To better the condition of its own citizens, and it may be to prevent pauperism among them, the legislature has declared that the moneys of the state shall go to the people of the state. The equal protection of the laws is due to aliens as to citizens (*Yick Wo* v. *Hopkins,* 118 U. S. 356, 369; *Lem Moon Sing* v. *United States,* 158 U. S. 538, 547); but equal protection does not mean that those who have no interest in the common property of the state, must share in that property on the same terms as those who have an interest.

In saying this, I assume that the purpose of the statute

is not to promote efficiency in the doing of the work, but to discriminate in the distribution of the public wealth in favor of the citizen. There may be forms of employment where efficiency would be promoted by the employment of citizens, and if the statute were restricted to such employments, its validity would not be doubtful. Just as the state may confine to citizens the right to hold public office, so, on the same ground, it may confine to citizens the right to serve the state in any way, whenever there is a relation between the exclusion of aliens and the promotion of efficiency. There are many lines of service where it is conceivable that the employment of citizens will make for a stable administration. If the government were to take over the railroads, there would be force in the argument that the trains should be run by citizens on whose loyalty the government might depend in times of national disaster. We have grown accustomed to the government's administration of the mails, and none of us doubts that the service is one from which aliens may be excluded. In all these branches of employment, it is not difficult to discover some relation between citizenship and efficiency. The prohibition of alien labor in this statute is, however, unrestricted. It applies to the most temporary and occasional service, and to the lowest grades of labor. Even in those cases, it is for the legislature, according to the People's claim, to determine whether some relation exists between efficiency and citizenship; between loyalty in service, and service by the loyal. Such tests of fitness have a fair relation to permanent positions where a spirit of allegiance to the employer may be cultivated. It seems far fetched, however, to apply them to the task of day laborers excavating for sewers or digging trenches for a subway. The relation in such circumstances is so remote that we may consider it illusory. At least, I shall so assume for the purpose of this discussion. The statute has been frankly defended at our bar as a legitimate preference of citizens,

not to promote the efficiency of the work, but to promote the welfare of the men preferred; and from that aspect, it will be frankest and safest for us to view it.

To concede that such a preference was intended, is not to condemn the statute as invalid. The state in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens rather than that of aliens. Whatever is a privilege rather than a right, may be made dependent upon citizenship. In its war against poverty, the state is not required to dedicate its own resources to citizens and aliens alike. "The relief of the poor, the care of those who are unable to care for themselves, is among the unquestioned objects of public duty." (BREWER, J., in *State ex rel. Griffith* v. *Osawkee Township*, 14 Kan. 421.) The modern state everywhere is mindful of that duty. It has extended its bounty in large measure, though not without some discrimination, to aliens; but it would not trench upon their rights under the constitution if it were to confine its bounty to its citizens. As it may discriminate between citizens and aliens in relief, so also it may discriminate in employment. When payment for public works is to be made from public funds, it may prefer in employment its own citizens, since to them the legislature may believe that the first duty is owing. (*United States* v. *Realty Co.*, 163 U. S. 427, 440.) Everywhere throughout the world the state, in its relation to the laborer, is assuming a larger obligation; but it cannot be that it owes this obligation to citizens and aliens in equal measure. In Great Britain there was enacted in 1908 a statute providing for old age pensions, restricted, it may be noted, to British subjects. (8 Edw. 7, chap. 40, sec. 1.) In the same kingdom there was enacted in 1911 a statute providing for insurance against unemployment. (1 & 2 George 5, chap. 55.) In our own country the workmen's compensation laws that have been adopted in many states are phases of the same world-wide movement. We are

not concerned at this time with the validity of these measures for the alleviation of the laborer's lot. We mention them as illustrations of an expanding conscious-ness in the modern state that relief against unemploy-ment, both after the event and before it, is part of the state's function. In one of our states the courts have sustained a law providing for state help to farm-ers. (*North Dakota* v. *Nelson Co.*, 1 N. D. 88.) How far the state will go beyond its own citizens in thus applying its own resources to the betterment of conditions, the legislature must say. Preferences to relieve against pauperism after it has become an accom-plished fact do not violate the rights of aliens. Prefer-ences to avert a threatened pauperism, or to render pauperism impossible, stand on the same footing. In each instance the state announces as its public policy that the common property shall be used for the benefit of its common owners.

The argument is made, however, that there is a dis-tinction between the right of government to exclude aliens from its own employment and the right to exclude aliens from employment by independent con-tractors. The ruling of the Supreme Court of the United States in *Atkin* v. *Kansas* (191 U. S. 207), and in *Ellis* v. *United States* (206 U. S. 246) goes far to invalidate the distinction. The first case considered a statute of Kansas prohibiting the employment of laborers for more than eight hours a day on any public work. The statute was held valid in its application to laborers in the service of contractors. The second case sustained a like statute, passed by Congress, to regulate employ-ment on public works in the District of Columbia. The presence of an independent contractor, interposed between the state and the laborer, did not check the power of the government to prescribe the hours of labor. But with-out reference to those decisions, the distinction is inade-quate. In a real and substantial sense, it is the money of

the state that is paid to the laborers, though the distribution is made through the medium of contractors. That money constitutes the fund out of which the wages of laborers are payable. This is not only true as an economic and social fact. It is true also as a statement of the legal rights of those concerned. The state (Lien Law [L. 1909, ch. 38], sec. 5) has given to any laborer employed by a contractor in the construction of a public improvement, a lien for the value of his labor upon the moneys of the state applicable to that improvement. The state has thus defined the channels through which the payment must be made. It has assumed a direct obligation not only to its own employees, but also to the employees of contractors on its works. To say that the latter class of employees receive, not the state's moneys, but those of the contractors, is to put form above substance. The great problems of public law do not turn upon these nice distinctions. The fundamental powers of the state and the fundamental rights of man are built upon a broader basis. The truth and substance of the situation is that the contractor's employees are doing the state's work, and are paid out of the state's moneys; and this truth ought not to be obscured by distinctions between contractors and servants established to fix the gradations of civil liability.

I do not ignore what was said in *People* v. *Orange County Road Construction Co.* (175 N. Y. 84). There is a suggestion in that case, but not a ruling, that a distinction exists between employees of the state and those of a contractor in respect of the state's power to regulate the hours of labor. The later case of *Atkin* v. *Kansas* (191 U. S. 207) has obliterated the distinction, and so it was conceded in *People ex rel. Cossey* v. *Grout* (179 N. Y. 417). It is now perceived that all persons engaged on the public works, from the highest officers to the lowest laborers, through all the gradations of contractors and subcontractors, are, in a very vital sense, in the service

of the state. The state has a legitimate concern in the selection of the men to be employed from one extreme of the official hierarchy to the other. Whether they are called officers or employees does not matter. The power of the legislature depends upon the substance of things, and not upon names and labels.

To hold that this statute violates the federal constitution would be to ignore the contrary judgment expressed in the constitutions and legislation of many other states. There is a like provision in the constitution of Arizona (Art. 18, sec. 10), a constitution which was approved (so far as this provision is concerned) by joint resolution of congress (37 U. S. Stat. at Large, p. 39). There are like provisions in the constitution of Idaho (Art. 13, sec. 5), and in that of Wyoming (Art. 19, § 1), which were also approved by congress. There is a like provision, restricted, however, to Chinese, in the constitution of California (Art. 19, sec. 3). There are like provisions applicable to all aliens in the statutes of Massachusetts (Acts of 1909, chap. 514, sec. 21), New Jersey (Compiled Statutes of New Jersey, 1910, p. 3023, sec. 15), Pennsylvania (Purdon's Digest [13th ed.]; vol. 2, p. 2172, sec. 8), and California (California Code, 1906, Act No. 127, General Laws of California). Legislation similar in purpose may be found in Montana (Revised Code, sec. 2250), Nevada (Revised Laws of Nevada, 1912, sec. 3483), Oregon (Laws of Oregon, sec. 6267) and Hawaii (Acts of Congress, Revised Laws 1905). Unless the case against this statute is a clear one, the courts may not ignore this concurrence of opinion (*Lemieux* v. *Young*, 211 U. S. 489, 493.)

In thus holding that the power exists to exclude aliens from employment on the public works, we do not, however, commit ourselves to the view that the power exists to make arbitrary distinctions between citizens. We do not hold that the government may create a privileged caste among the members of the state. (*Smith* v. *Texas*, 233 U. S. 630, 638.) We do not hold that it may dis-

criminate among its citizens on the ground of faith or color. (*Strauder* v. *West Virginia*, 100 U. S. 303; *Gibson* v. *Mississippi*, 162 U. S. 565; *Rogers* v. *Alabama*, 192 U. S. 226, 231.) A citizen may not be disqualified because of faith or color from service as a juror. (*Strauder* v. *West Virginia*, *supra*.) For like reasons we assume that he may not be disqualified because of faith or color from serving the state in public office or employment. It is true that the individual, though a citizen, has no legal right in any particular instance to be selected as contractor by the government. It does not follow, however, that he may be declared *disqualified* from service, unless the proscription bears some relation to the advancement of the public welfare. (*Strauder* v. *West Virginia*, *supra*, at page 305.) The legislature has unquestionably the widest latitude of judgment in determining whether such a relation exists, but we are not required to hold that there is no remedy against sheer oppression. Where the line must be drawn, we do not now determine. We do not say that the legislature could single out A and B by name, and declare that, though citizens, they should never be employed on any public work. It may well be that such disqualification would be illegal under the fourteenth amendment of the federal constitution, in that it would deny to the citizens thus arbitrarily excluded the equal protection of the laws, and illegal also under our state constitution, which provides (Art. 1, sec. 1): "No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers." This opinion has failed of its purpose if it has failed to demonstrate that those provisions are without application to the exclusion of aliens from the enjoyment of the state's resources.

It must also be evident that nothing in this opinion gives countenance to the view that the government may deny to aliens the right to engage in any private trade or calling on

terms of equality with citizens. (*Yick Wo* v. *Hopkins*, 118 U. S. 356, 369; *Matter of Parrott*, 1 Fed. Rep. 481.) If the calling is one that the state, in the exercise of its police power, may prohibit either absolutely, or conditionally by the exaction of a license, the fact of alienage may justify a denial of the privilege. (*Patsone* v. *Pennsylvania*, 232 U. S. 138; *Comm.* v. *Patsone*, 231 Penn. St. 46; *Comm.* v. *Hana*, 195 Mass. 262; *Bloomfield* v. *State*, 86 Ohio St. 253; *State* v. *Travelers Ins. Co.*, 70 Conn. 590, 600.) There must, however, be some relation in such cases between the exclusion of the alien and the protection of the public welfare. But subject only to the exercise of the police power, it is true that in dealings between man and man, the alien and the citizen trade and labor on equal terms. It *is* a denial of the equal protection of the laws when the government, in its capacity as a lawmaker, regulating, not its own property, but private business, bars the alien from the right to trade and labor. It is not a denial of the equal protection of the laws when the government, in its capacity as proprietor, issuing a mandate to its own agents (*United States* v. *Martin*, 94 U. S. 400; Carter, Law, its Origin, Growth and Functions, p. 230), bars the alien from the right to share in the property which it holds for its own citizens.

Because the state may thus discriminate in favor of the citizen in regulating employment on its public works, it does not follow, however, that it may exclude aliens from the enjoyment of those works after they have been completed. Aliens may use the public highways as freely as citizens. Aliens may use the railroads and other agencies of transportation as freely as citizens. The reason is that the right to move about from place to place within the state is incidental to the right to live within the state. There are probably many other public works so intimately related, if not to life, at least to health and comfort, that merely arbitrary or oppressive

discrimination against the alien in regulating their use, would be a denial by the state of the equal protection of the laws. To attempt to draw the line in advance is futile. The question must in each case be whether the use is one that is reasonably incidental to life under modern conditions in a civilized state, or whether it is rather a privilege which the state may grant or may withhold. To be employed by the state on the public works, and to receive payment out of the public purse is, I think, a privilege rather than a right. (*Atkin* v. *Kansas, supra,* at p. 223.)

· The argument is made that if the statute is not invalid as in conflict with the fourteenth amendment of the constitution, it is invalid as in conflict with treaties between the United States and foreign nations. Typical of these treaties is the one with Italy. It provides: "The citizens of each of the high contracting parties shall have liberty to travel in the States and Territories of the other, to carry on trade, wholesale and retail, to hire and occupy houses and warehouses, to employ agents of their choice, and generally to do anything incident to, or necessary for trade, upon the same terms as the natives of the country, submitting themselves to the laws there established. The citizens of each of the high contracting parties shall receive, in the States and Territories of the other, the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are, or shall be, granted to the natives, on their submitting themselves to the conditions imposed upon the natives." This treaty, in my judgment, does not limit the power of the state, as a proprietor, to control the construction of its own works and the distribution of its own moneys.

The argument is also made that discrimination between citizens and aliens may increase the cost of public works by limiting the supply of labor; and that to do this, in order to better the condition of our laborers, is to

violate restrictions of the constitution of the state.  Article VIII, section 9, of the state constitution provides that "neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking."  Article VIII, section 10, provides, "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, or become directly or indirectly the owner of stock in, or bonds of, any association or corporation; nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes.  This section shall not prevent such county, city, town or village from making such provision for the aid or support of its poor as may be authorized by law."  The money that goes to laborers on public works is not given or loaned in aid of individuals within the meaning of these provisions.  It is paid for service rendered.  That is the direct and primary purpose of the payment.  The primary and direct purpose being legal, the payment does not become illegal because a collateral and secondary purpose may be to protect a large class of the community against the peril of pauperism.  In the long run, the payment may be found to have lessened the public burdens rather than to have increased them. (*Noble State Bank* v. *Haskell*, 219 U. S. 104, 110, 111.) The same argument was made against the validity of the statute for an eight-hour day.  It was said that the result would be to increase the cost for the benefit of favored classes.  The legislature is now empowered by the constitution to fix the wages and salaries of all employees upon the public works.  This authority embraces the direct increase of expense by increasing salaries beyond the minimum fixed by competition.  It must also embrace the indirect increase of expense by regulations of employment tending to diminish competition.

I have not overlooked, though I have not attempted to analyze, the decisions of this court in which the statutes governing the hours of labor on public works were the subject of discussion. (*People ex rel. Rodgers* v. *Coler*, 166 N. Y. 1; *People* v. *Orange County Road Construction Co.*, 175 N. Y. 84; *Ryan* v. *City of New York*, 177 N. Y. 271; *People ex rel. Cossey* v. *Grout*, 179 N. Y. 417.) The specific proposition there decided has ceased to be law in this state. So far as it was founded on the theory of a conflict between the statute and the federal constitution it was overruled by the United States Supreme Court in *Atkin* v. *Kansas* (191 U. S. 207). So far as it was founded on the theory of a conflict between the statute and the constitution of this state it was superseded by the amendment of the constitution in 1905. (Const. art. 12, sec. 9; *People ex rel. Williams E. & C. Co.* v. *Metz*, 193 N. Y. 148.) The earlier cases are no longer authorities, therefore, for any proposition actually decided. Their reasoning may still instruct, but can no longer control us. They were decided in nearly every instance by a bare majority. In at least one instance a majority did not unite in anything more than the result. It would serve no useful purpose to review the varying opinions at this time. It is enough to say that they are not decisive of the case at hand.

This statute must be obeyed unless it is in conflict with some command of the constitution, either of the state or of the nation. It is not enough that it may seem to us to be impolitic or even oppressive. It is not enough that in its making, great and historic traditions of generosity have been ignored. We do not assume to pass judgment upon the wisdom of the legislature. Our duty is done when we ascertain that it has kept within its power. (*Bertholf* v. *O'Reilly*, 74 N. Y. 509, 515; *People* v. *Gillson*, 109 N. Y. 389, 398; *Atkin* v. *Kansas, supra.*) " It must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great

a degree as the courts." (HOLMES, J., in *Missouri, Kansas & Texas Ry. Co.* v. *May*, 194 U. S. 267, 270.)     If doubt exists whether there is a conflict between the statute and the constitution, the statute must prevail. (*Barrett* v. *Indiana*, 229 U. S. 26, 31; *People.* v. *Gillson, supra.*) These guiding principles are not to be honored by lip service only.     Mischief and hardship, it is said, will follow the enforcement of this law.     If that is so, we cannot help it.     To correct those evils, if they shall develop, will be the province of legislation.     The statute does not withold from the alien the rights secured to him by the constitution; and we must enforce it as the law.

The judgment of the Appellate Division should be reversed, and the judgment of conviction affirmed.

WILLARD BARTLETT, Ch. J. (concurring).     Whatever may be my own views as to the wisdom or fairness of the statute before us, I am entirely clear that it is constitutional and that the question is settled by the decision both of the United States Supreme Court and of this court.

These decisions establish the proposition that the state in the prosecution of a public work stands in just the same position as an individual; that it may prescribe the conditions on which it will contract for such work; and that it may make the violation of his contract on the part of the contractor a criminal offense.     It is so held in *Atkin* v. *Kansas* (191 U. S. 207, 223) where the Supreme Court of the United States said that "no employee is entitled, of absolute right and as a part of his liberty, to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do." This language was quoted with approval by this court in *People ex rel. Williams Eng. & Contr. Co.* v. *Metz* (193 N. Y. 148) and the doctrine therein declared thus

received the sanction of all the judges who sat in that case.

In *Ellis* v. *United States* (206 U. S. 246, 256), which involved the validity of a Federal labor law, it was held that "the government purely as a contractor, in the absence of special laws, may stand like a private person, but by making a contract it does not give up its power to make a law;" and in the exercise of this power it may declare a violation of his contract by the contractor to be a crime. In answer to a suggestion that the purpose of the statute was to secure to labor certain advantages in conditions over which Congress has not general control, Mr. Justice HOLMES said that the existence of such a motive would not render a law unconstitutional which was otherwise valid and that the power which Congress has over the mode in which contracts with the United States shall be performed could not be limited by a speculation as to motives.

However subsequent legislation or adjudications may have modified the effect of the decision in *People* v. *Orange County Road Construction Co.* (175 N. Y. 84, 90) it still remains true, as was said by Judge CULLEN in that case, that "if the state itself prosecutes a work it may dictate every detail of the service required in its performance; prescribe the wages of workmen, their hours of labor, and the particular individuals who may be employed. * * * The state in this respect stands the same as its citizens."

How great the rights of private citizens are in their status as employers is aptly illustrated by *Jacobs* v. *Cohen* (183 N. Y. 207) where this court held that the contract between an employer and a labor union whereby the employer agreed for a certain period to employ only members of the union was not violative of public policy or otherwise forbidden by law. In the opinion we reiterated the assertion made in *National Protective Association, etc.,* v. *Cumming* (170 N. Y. 315, 341) that every man

has a right "to carry on his business in any lawful way that he sees fit. He may employ such men as he pleases and is not obliged to employ those who, for any reason, he does not wish have work for him."

It seems to me that the only constitutional prohibition which can be relied upon with any confidence to invalidate the statute forbidding the employment of aliens upon the public works of this state, is the provision of the Fourteenth Amendment to the Federal Constitution which declares that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

If it is a denial of the equal protection of the laws for an employer of labor to refuse to afford a designated class of persons an opportunity to work for him, it must be conceded that this statute was enacted in disregard of the constitutional provision thus invoked.

I can find no reason to suppose, however, that the Fourteenth Amendment was designed to limit or restrict the rights of a state as an employer of labor. Other employers, individual or corporate, possess the undoubted and absolute right to withhold employment from whomever they see fit. The Constitution could hardly have been intended to deprive the states of equality with private employers in this respect; yet if the Fourteenth Amendment invalidates the statute in question, the great railroad corporation which is erecting its new building in Albany to-day may refuse to allow aliens to work upon it, while the state of New York, in repairing the capitol, must give aliens an equal opportunity with citizens to aid in its reconstruction.

The statute is nothing more, in effect, than a resolve by an employer as to the character of his employees. An individual employer would communicate the resolve to his subordinates by written instructions or by word of mouth. The state, an incorporeal master, speaking through the legislature, communicates the resolve to its agents by enacting a statute. Either the private

employer or the state can revoke the resolve at will. Entire liberty of action in these respects is essential unless the state is to be deprived of a right which has heretofore been deemed a constituent element of the relationship of master and servant, namely, the right of the master to say who his servants shall (and therefore shall not) be.

If the alien labor law under consideration is violative of the Fourteenth Amendment, the preference given to veterans by the Constitution of the state of New York must likewise be invalid. (Const. of New York, art. V, sec. 9.) Appointments and promotions in the civil service of the state and of all civil divisions thereof, including cities and villages, are thereby required to be made according to merit and fitness to be ascertained as far as practicable by examinations, which so far as practicable shall be competitive; "provided, however, that honorably discharged soldiers and sailors from the army and navy of the United States in the late civil war, who are citizens and residents of this state, shall be entitled to preference in appointment and promotion, without regard to their standing on any list from which such appointment or promotion may be made." Here is a preference in the public service based wholly upon a status acquired half a century ago, and a preference of one class of citizens over all others. There could not be a clearer case of discrimination. I think that the Federal Constitution permits such discrimination; but I should not think so if it be held that the statute in question here is in conflict with the Fourteenth Amendment.

The differences of opinion upon the present appeal are necessarily radical and depend upon the question whether the denial of an opportunity to work for the state is a denial of the equal protection of the laws. For the reasons which I have briefly stated, in addition to those set forth so clearly and cogently in the opinion of my brother CARDOZO, I think this question must be answered in the negative. I do not believe that either the Fourteenth

Amendment or any other of the constitutional provisions relied upon by the respondent was designed to limit the right of the state to choose its own servants.

SEABURY, J. (concurring).    This case in no way involves the right of private citizens to employ aliens in private work.    It presents only the question of the right of the state to exclude aliens from employment upon its public works.    The distinction is vital and must be kept in mind throughout the discussion of this case.

I concur in the opinion that the statute is constitutional. I agree that, because of the public character of the work to which the statute relates, the discrimination against aliens is not an arbitrary discrimination.    I agree also that the law cannot be upheld upon the ground that it is designed to promote efficiency upon the public works of the state.    The present case, as I view it, does not involve merely the right of the state to prescribe the manner in which its public money may be distributed. The money expended for public works would necessarily be expended whether citizens or aliens were engaged in constructing them.    The money paid by the state for this purpose is not a gratuity, but is paid as compensation for services rendered and the rendering of these services creates a public value at least equal to the money expended.    The distribution of public money for this purpose is only an incident of the state's exercise of its right as proprietor and owner of its public works.    This case involves the right of the state as owner or proprietor to exclude aliens from working upon its public works and to accord to its own citizens a preference in being employed upon such public works, over other citizens of the United States.    No citizen, as an incident of citizenship, has any *right* to be employed upon public works.    If to be employed upon public works is in any sense a right or privilege under the State Constitution (Art. 1, sec. 1), it is equally so under the provisions of the Fourteenth

12

Amendment to the Federal Constitution. Thus if the right to be employed on public works is a right or privilege incident to citizenship the state might discriminate against aliens, but it could not, under the provisions of the Federal Constitution, discriminate in favor of its own citizens against citizens of another state. Yet the state may discriminate as between its own citizens and citizens of a sister state, and even in favor of some of its citizens and against others as to the use that shall be made of its own property. (*People* v. *Lowndes*, 130 N. Y. 455; *Haney & Scattergood* v. *Compton*, 36 N. J. L. 507; *Geer* v. *Connecticut*, 161 U. S. 519; *Corfield* v. *Coryell*, 6 Fed. Cas. 546; *Commonwealth* v. *Hilton*, 174 Mass. 29; *McCready* v. *Virginia*, 94 U. S. 391.) No citizen has any constitutional right or privilege to be employed upon public work, or any immunity against discrimination in this respect, either under article 1, section 1, of the Constitution of the state or under the Fourteenth Amendment to the Federal Constitution. The legislature has the right to prescribe who shall work upon its public works. Public works are public property. As such they belong wholly to the sovereign power of the state. The manner in which they shall be built is within the function of the sovereign power to prescribe. This regulation and control is a part of the police power of the state. The police power of the state is not limited to exerting control over private property to promote the general welfare. It is by virtue of this power that the state possesses the exclusive right to construct and control its public property. I am aware that objection has been made to the use of the term "police power" to include the regulation by the state of its internal affairs, on the ground that it uses the terminology that has often been associated with the regulation of private affairs external to the state. Notwithstanding this objection, the nature of the power exerted is the same, whether it is exercised over the public property of the state itself or over the private

1915.]  Opinion, per SEABURY, J.  [214 N. Y.]

property of the citizen.  The highest judicial authority exists for applying the term "police power" to both public and private property.  (*New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650; *People* v. *Kerr*, 27 N. Y. 188, 213; *Haney & Scattergood* v. *Compton*, 36 N. J. L. 507.)  In *New Orleans Gas Co.* v. *Louisiana Light Co.* (115 U. S. 650, 661) the Supreme Court of the United States, speaking of the police power, said: "We may, not improperly, refer to that power the authority of the state to create educational and charitable institutions, and provide for the establishment, maintenance, and control of public highways, turnpike roads, canals, wharves, ferries, and telegraph lines, and the draining of swamps." Questions of great difficulty may present themselves as to how far the state may impose restraints or limitations upon the exercise of individual rights over private property but no such questions are presented as to public property.  Public property is in its very nature subject to social control.  The authority of the state over all public works and public undertakings is supreme and this is so whether the public works are undertaken directly by the state or by a municipality or any other agency of the state.  Just as the individual may, generally speaking, do what he will with his own, so the state, may exercise a like control over public property.  In the same way that *private* property is subject to *individual* control, so *public* property is subject to *governmental* control.  The provisions of the State and Federal Constitutions guaranteeing liberty and property, refer to individual liberty and private property.  They do not confer upon the individual, be he citizen or alien, the right to interfere with the use that the state may make of its public property or any regulation which it may prescribe as to the manner in which its public works shall be built.  The constitutional safeguards which surround the liberty of the individual confer upon him no right or liberty to engage in public

work. The statute under consideration does not involve governmental interference with individual liberty. The attempt of the contractors engaged in public work to deprive the state of the right to prescribe the conditions upon which the work shall be done, is the assertion of the right of individual interference with the government. The manner in which public works shall be built is a matter wholly within the sphere of social as distinguished from individual control. We cannot lose sight of the fact that there are these separate and distinct spheres of action. It may not be possible to draw with precision the line of demarcation between them, but we all nevertheless recognize that there is a line of demarcation to be drawn. As we deny to the state the right to intrude into the individual sphere of action and to prescribe what we shall believe, and except where the public welfare is involved, what we shall publish, or to supervise private morals, so the state denies to the individual the right to intrude within its social sphere of action and insist that he has a right to be employed upon its public works. The right of state control springs from the public or social character of the work. Owing to the narrow sphere to which the state's activities have, in the past, been limited, the assertion of the state's right of public property seems to have been confined principally to unappropriated lands, waters, wild beasts, fishes and birds, but over those things to which the state's right of property attached the old books recognized the proprietary right of the sovereign power which carried with it the right to discriminate either against subjects or foreigners. (Grotius " Rights of War and Peace," book II, chapter II, § 5.) In recent times the state's proprietary interests have been greatly extended. Over those interests it enjoys the right of a proprietor or owner. The public property of the modern state is not inconsiderable. It owns its highways, harbors, canals, aqueducts, bridges, markets, libraries, art galleries and

1915.]              Opinion, per SEABURY, J.              [214 N. Y.]

many other valuable possessions. Over all these things and others of a like nature the state is now proprietor and owner. Its sphere of ownership is being constantly extended. Formerly the functions represented by the public properties enumerated above were left entirely to individual initiative as indeed were also such functions as the army, navy, police and courts of justice now perform. The performance of these services are necessary to the enjoyment of modern social life and the welfare of the citizenship of the state depends upon their proper administration. The uses to which these public properties shall be put are to be determined by the legislature subject only to the Constitution. There are, generally speaking, no provisions of the Constitution that impose limitations upon the exercise of the legislative power over these properties, except such as are inherently attached to the exercise of the police power. Nor is it apparent that this extension of the state's activity has in any way violated the liberty of the citizen. The exercise by the state of these activities may in a negative sense have restricted the liberty of some, but in a positive sense the freedom of all has been increased on account of them. In the building of the state's public work we have an example through the exercise of the powers of government of the organized co-operation of our citizenship. In its capacity of owner and proprietor, the state is not hampered by restrictions as to the manner in which it shall cause its public works to be constructed. There are many uses to which an owner or proprietor may put his property which do not violate the rights of others. The state in its capacity of proprietor or owner may make such use of its own public property as it deems conducive to the social well-being. In the use that it makes of such property it is not required to refrain from discrimination. The largest measure of benefit may sometimes result from discrimination. Whether or not discriminations made in regard to public

property sustain a relation to the public welfare is for the legislature and not the courts to determine. The modern state, through the ownership of its public property, affords opportunities for public co-operation. The motive which actuates it is service, not profit. Its service, to be effective, must be rendered where it is needed and in rendering it it is not obliged, in the use of its public property, to secure immediate equality of benefits to all; it is sufficient if the ultimate result be to promote the general welfare. The public property or commonwealth should of course be used to promote the general welfare, but the restraints or checks to which government is by constitutional provisions subjected, when it acts in reference to private property, have no application where it acts in relation to public property. Within this sphere and in regard to this public property, government is free to prescribe such regulations as will best promote the general welfare. Where the state has, in a particular sphere, replaced private enterprise, as it has replaced it in the control and building of its public works, it cannot effectively accomplish its purpose if it is to be hampered by the same restraints which are imposed upon it when it exercises its authority over private property. Where it acts in its capacity of proprietor or owner in reference to its own public property, these restraints can only serve to hamper and embarrass the state in the exercise of its rights of ownership. If, in the exercise of the police power, the state may regulate *private property* to promote the general welfare of its citizens, *a fortiori* it may, by virtue of that power, exercise control over its own public property.

Public works, like other public property, are within the police power of the state. The character of the work to which the statute under consideration applies being public, the statute itself is an exercise by the sovereign of its police power. The statute being an exercise of the police power of the state it necessarily follows that the provi-

sions of the Fourteenth Amendment of the Federal Constitution and article 1, section 1, of the Constitution of this state, so far as they guarantee the right of individual liberty and property, are without application. As Mr. Justice FIELD said: "No one has ever pretended, that I am aware of, that the Fourteenth Amendment interferes in any respect with the police power of the state." (*Bartemeyer* v. *Iowa,* 18 Wall. 129, 138.) In *Olsen* v. *Smith* (195 U. S. 332) it was held that although state laws concerning pilotage are a regulation of commerce, they fall within that class of powers which may be exercised by the states until Congress has seen fit to act upon the subject. In that case the argument was made that the right of a person who is competent to perform pilotage services to render them, is an inherent right guaranteed by the 14th Amendment and that, therefore, all state regulations providing for the appointing of pilots and restricting the right to pilot to those duly appointed was repugnant to the 14th Amendment. In reply to this contention, Mr. Justice WHITE said: "But this proposition in its essence simply denies that pilotage is subject to governmental control, and therefore is foreclosed by the adjudications to which we have previously referred." (p. 344.) The state has generally speaking, the right to employ upon public work whom it will and to prescribe such conditions as it sees fit to prescribe. It has the right to employ certain citizens to the exclusion of others and the citizens not so employed are not in any legal sense unlawfully discriminated against. As was said by Mr. Justice HARLAN in *Atkin* v. *Kansas* (191 U. S. 207, 222): "It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on

behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern." In replying to the contention that a state regulation as to the manner in which public work should be performed was a violation of the liberty of the employee and employer, Mr. Justice HARLAN said: " It is sufficient to answer that no employé is entitled, of absolute right and as a part of his liberty, to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do." (p. 223.) If the legislature can lawfully discriminate between citizens as to whom it will employ upon its public works, it follows that it can also discriminate as between citizens and aliens. The whole matter as to how public works shall be built rests entirely within the police power of the state. The recognition of this principle seems to me to solve many of the difficulties that otherwise attach to this case. It is manifest that aliens as well as citizens are subject to the exercise of the police power. Nor can it be correctly contended that any treaty that exists between the United States and any foreign government excludes the citizens of that government who reside here from the operation of the police power of the state. If the police power includes, as has been said, " the power to govern men and things " (*Munn* v. *Illinois*, 94 U. S. 113, 125), that power does not become less potent when it is applied exclusively to public property being used for public purposes. So far as those trades or callings which are subject to governmental regulations are concerned, it is settled that the state may refuse to grant to aliens because of the fact of alienage, a license to engage in them. (*Patsone* v. *Pennsylvania*, 232 U. S. 138; *Commonwealth* v. *Patsone*, 231 Penn. St. 46; *McCready* v. *Virginia*, 94 U. S. 391; *State* v. *Travelers*

*Insurance Co.,* 70 Conn. 590; *Matter of O'Neill,* 90
N. Y. 584; *Opinion of Justices,* 122 Mass. 594; *Bloomfield
v. State,* 86 Ohio St. 253.)   If the state may debar aliens
from participating in those private occupations or trades
which are subject to governmental regulation, as has
been held in the cases cited, there is no room for the
argument that it cannot debar aliens from working upon
its own public works which are wholly subject to its con-
trol.   In the assertion by the state of its right to control
the manner in which public work shall be constructed, it
is immaterial whether the public work is done directly
by the state or by a municipality or independent con-
tractor.   (*Atkin* v. *Kansas,* 191 U. S. 207; *Ellis* v.
*U. S.,* 206 U. S. 246; *People ex rel. Cossey* v. *Grout,* 179
N. Y. 417.)   If the work was private and the public wel-
fare in no way involved, it is clear that the legislature
could not deny to the individual employer the right to
employ aliens.   (*Yick Wo* v. *Hopkins,* 118 U. S. 356, 369.)
If the work was private, and the exclusion of aliens was in
fact necessary to the protection of the public welfare, such
exclusion would be within the police power.   (*Yick Wo* v.
*Hopkins, supra.*)   Where the work, as in the case under
consideration, is public and, therefore, wholly subject to the
police power, the exclusion of aliens need not be shown to
sustain any relation to the public welfare in order to be
valid.   In such case, the exclusion is merely an incident
of that social control to which such public works are, in
all respects, subject.   The fact that the state may exer
cise complete control over its public works or other public
property does not carry with it the right to use its public
property so as to violate the rights of either its citizens or
aliens to life, liberty or property.   The state, no less than
the individual, is obligated to so use its public property,
except when it acts to promote the general welfare, as
not to impair the rights of others.   For this reason it
cannot lawfully exclude either citizens or aliens from its
public highways or deny to either the right to participate

in the benefits of those public utilities which it may own and operate and upon the equal administration of which the welfare and happiness of others depend. The limitations to which the state is subject in the construction and use of its public works are only those to which the police power is subject. These restraints it is not now necessary to consider, as they have no application to the exclusion of aliens from working upon public work. It is sufficient, I think, to point out that discriminations on account of race or religion, that sustain no relation to the general welfare are not within the police power.

In my opinion the judgment of the Appellate Division reversing the judgment of conviction should be reversed and the judgment of conviction affirmed.

COLLIN, J. (dissenting). This appeal requires us to determine whether or not section 14 of the Labor Law is a constitutional enactment. The section is:

"§ 14. Preference in employment of persons upon public works.— In the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public works, preference shall be given citizens of the state of New York. In each contract for the construction of public works a provision shall be inserted, to the effect that, if the provisions of this section are not complied with, the contract shall be void. All boards, officers, agents or employees of cities of the first class of the state, having the power to enter into contracts which provide for the expenditure of public money on public works, shall file in the office of the commissioner of labor the names and addresses of all contractors holding contracts with said cities of the state. Upon the letting of new contracts the names and addresses of such new contractors shall likewise be filed. Upon the demand of the commissioner of labor a con-

tractor shall furnish a list of the names and addresses of all subcontractors in his employ. Each contractor performing work for any city of the first class shall keep a list of his employees, in which it shall be set forth whether they are naturalized or native born citizens of the United States, together with, in case of naturalization, the date of naturalization and the name of the court where such naturalization was granted. Such lists and records shall be open to the inspection of the commissioner of labor. A violation of this section shall constitute a misdemeanor and shall be punishable by a fine of not less than fifty dollars nor more than five hundred dollars, or by imprisonment for not less than thirty nor more than ninety days, or by both such fine and imprisonment." (Laws of 1909, ch. 36 [Cons. Laws, ch. 31], § 14.)

The defendant, in constructing sewer basins pursuant to a contract between the city of New York and himself, employed persons who were not citizens of the United States, one of whom came from Italy. The judgment of the Court of Special Sessions of the city convicting him of a misdemeanor therein was reversed by the Appellate Division solely for errors of law.

The question before us, necessitating as it does a decision concerning fundamental civic principles, is of unusual gravity. With the wisdom or unwisdom, the justice or injustice of the enactment, or the practical effects of our decision, we have no concern; those matters are within the legislative power and are not subject to review by us. This court has neither the inclination nor the power to encroach upon the legislative department of the government of the state or assume any part of its functions or responsibilities. The measure of our duty is exhausted in ascertaining the legislative intention expressed in the enactment and determining and declaring with cold neutrality that it either does or it does not ignore and transcend the limits which the people of the state, conscious that free government consists largely in rigid

restrictions upon itself imposed and acquiesced in by the governed, have placed by the Constitution upon themselves and their representatives. State and people are inseparable ideas, for the state is the form in which the people have become organized.

The statute, through the intent expressed by it, if valid, prohibits the state and all the counties, towns, cities and villages thereof and all contractors with the state or any of those municipalities from employing all persons not born or naturalized in and subject to the United States (Const. of U. S. art. XIV, § 1) — all aliens — in the construction of public works, that is, fixed works for public use. (*Ellis* v. *Common Council of Grand Rapids,* 123 Mich. 567; *Ellis* v. *United States,* 206 U. S. 246.) It, in form, deprives contractors with the state or any municipality of the right to employ aliens and it deprives all aliens of the right of being subjects of employment, of the right to offer their labor for wages, in such construction. Its purpose, avowedly, is to promote the welfare of wage-earning citizens by destroying competition from aliens in the construction of all public work within the state. The briefs and arguments of the counsel are in accord with those conclusions.

The respondent asserts that the enactment is in conflict with and, therefore, void under certain provisions of the State and Federal Constitutions. Of those, we cite the following: "No person shall * * * be deprived of life, liberty or property without due process of law." (Const. of State, art. I, § 6.) "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." (Const. of the U. S. art. XIV, § 1.) While the immediate inducement to and purpose in the adoption of this article of the United States Constitution was the pro-

tection of the liberty and property of colored persons, it is effective as a guaranty, additional to those of the State Constitutions, against encroachment by the legislatures of the states upon the fundamental and constitutional rights of any person. (*Holden* v. *Hardy,* 169 U. S. 366, 382.) It is established, beyond useful questioning or discussion, that aliens equally with citizens are under and protected by the constitutional guaranties invoked by the defendant here. (*Yick Wo* v. *Hopkins,* 118 U. S. 356; *State* v. *Montgomery,* 94 Me. 192; *Commonwealth* v. *Hana,* 195 Mass. 262.) Within their operation citizen and alien are legal equals and alienage is not and cannot be a basis or justification of differentiation or discrimination between them.

The legislative power of the people of the state is plenary except as they have abridged it by the State Constitution or consented to its restriction by the Federal Constitution. That power is vested in the legislature. The statute under consideration is valid unless it transcends the constitutional restrictions already quoted; if it overpassed them it was and is as inoperative and impotent, as to persons lawfully assailing it, as if non-existent. Whether it did or did not is to be determined upon the general object or purpose sought therein by the legislature and its efficiency to effect it. The purpose of a statute impugned as unconstitutional must be determined from the natural and legal effect of the language employed, and whether it is or is not repugnant to constitutional provisions must be determined from its natural effect when put into operation. (*Lochner* v. *New York,* 198 U. S. 45, 64; *Henderson* v. *Mayor, etc., of N. Y.,* 92 U. S. 259, 268.) The statement already made of the intent and the general purpose to be effected by the statute under consideration need not be repeated.

Constitutional law has always deemed and declared the right to sell or purchase labor a part of the individual liberty and property safeguarded by the constitu-

tional provisions I have quoted. Refraining from referring to the many judicial expressions of the principle, I quote the most recent of those of the United States Supreme Court: "The principle is fundamental and vital. Included in the right of personal liberty and the right of private property — partaking of the nature of each — is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money." (*Coppage* v. *Kansas*, 236 U. S. 1, 14.) We have said: "Liberty, in its broad sense as understood in this country, means the right, not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation; all laws, therefore, which impair or trammel these rights, which limit one in his choice of a trade or profession, or confine him to work or live in a specified locality, or exclude him from his own house, or restrain his otherwise lawful movements (except as such laws may be passed in the exercise by the legislature of the police power, which will be noticed later), are infringements upon his fundamental rights of liberty, which are under constitutional protection." (*Matter of Jacobs*, 98 N. Y. 98, 106.) The principle has been frequently applied. (*Bertholf* v. *O'Reilly*, 74 N. Y. 509, 515; *People* v. *Marx*, 99 N. Y. 377; *People* v. *Gillson*, 109 N. Y. 389; *People* v. *Hawkins*, 157 N. Y. 1; *People ex rel. Tyroler* v. *Warden of City Prison*, 157 N. Y. 116; *People* v. *Williams*, 189

N. Y. 131; *Lochner* v. *New York*, 198 U. S. 45; *Adair* v. *U. S.*, 208 U. S. 161.) Any person who is banned by a statute from employment in the construction of the public works within the state is deprived of liberty and property; any person who is likewise banned from employing any other person in such construction is likewise affected. To constitute the deprivation, the inhibition of the statute need not include employment upon the construction of all works within the state. It need not be universal. The deprivation exists when the right to offer one's labor or services or the right to employ the labor or services of another upon a specified work or at a specified place or time is destroyed. (*People* v. *Williams*, 189 N. Y. 131; *People* v. *Hawkins*, 157 N. Y. 1; *Matter of Parrott*, 6 Sawyer [U. S.], 349.) The section 14 effects such deprivation and is unconstitutional and invalid unless there are conditions or legal principles justifying it. The appellants assert that there are.

The appellants assert, and as the chief and predominant support of their position, that the state has the right to declare, in the form of a statutory enactment, whom it and the municipalities will not employ, and contractors with them shall not employ upon public works and in public undertakings, and is in this respect as free and untrammeled as the individual employer. This claim is unrelated to and seeks no basis or justification in the police power of the state. It is oblivious of the existence of the police power. It rests exclusively upon the principle that the state is the owner and proprietor, as the guardian and trustee for the people, of the public works, undertakings and institutions, and as such proprietor has the right to control, manage and conduct them under such conditions, in such mode and with such employees and appointees as it will, exercising without limit, as may the individual employer, its judgment, choice or caprice. The authority directly relied upon to uphold the claim is *Atkin* v. *Kansas* (191 U. S. 207).

In the *Atkin* case was involved the validity under the Constitution of the United States of the statute known as the eight-hour law of Kansas. The law (speaking generally but with sufficient exactness) constituted eight hours a day's work for persons employed by or on behalf of the state or a municipality, the current rate of per diem wages in the locality where the work was performed the minimum wage to be paid and the requirement or allowance of more than eight hours' work per calendar day an offense. It provided, further, that persons employed by contractors with the state or a municipality or their subcontractors should be deemed employees of the state or the municipality. Atkin, in constructing a pavement in Kansas City, under a contract with it, permitted a person employed by him to work ten hours each calendar day, and by a court of Kansas was adjudged guilty of a violation of the statute. The Supreme Court of Kansas and the Supreme Court of the United States affirmed the judgment. The decision of the United States Supreme Court is expressly limited to the facts of that case. It was grounded in the two principles it enunciated: (a) The construction of the pavement was done by the state through a governmental agency and was of a public character; and (b) being of a public character, the statute, in regulating, as to those undertaking it, the mode in which and the conditions upon which it should be executed did not infringe the personal liberty of Atkin or his employees, and expressed a public policy with which the courts had no concern. The court said: "We rest our decision upon the broad ground that the work being of a public character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done. Its action touching such a matter is final so long as it does not, by its regulations, infringe the personal rights of others; and that has not been done."

(p. 224.)  Chief Justice FULLER and Justices BREWER and PECKHAM dissented from this decision.  (See, also *United States* v. *Martin,* 94 U. S. 400.)

The *Atkin* case does not authorize or decide the claim of the appellants.  It does not reach the basal element of the section 14.  The section destroys absolutely the liberty of aliens to contract to work, their right to tender and sell their labor and services, and the right of the contractors to hire them or buy their labor, in and for constructing any public works.  It does not fix the hours of each day through which an alien laborer may work or his compensation; it declares that an alien shall not be permitted to be a laborer and deprives him of the right to exercise the choice and freedom of being willing or unwilling to work upon public works under regulations enacted by the state, and the contractors of the right to employ him.  Undoubtedly, no one has an inherent right to work or perform work for the state, which may in the regular and orderly administration and management of its affairs and institutions, in its proprietary capacity, contract as and with whom it chooses, except as restricted by the Constitution, to which it is not superior in any capacity.  In the erection of a new capitol, for instance, it could select its architects, its decorators, its contractors and its superintendent and thereby reject the applications of those who were not selected.  This, however, differs substantially and inherently from a statutory enactment that in the construction of any public building by or for the state or a municipality only persons residing in the city of Albany shall be engaged or employed.  In the absence of the statute every person would be free to offer his labor and ability as he willed, and accept the terms, regulations and conditions fixed by the employer, whether state, municipality or contractor; with the statute every person residing elsewhere than in Albany would be deprived of that freedom, and to that extent of his liberty

13

and property.  The reasonable range and effect of a principle under discussion aids in determining its validity. The state is the proprietor of its educational, penal and charitable institutions equally with its public works.  The claim of the appellants, if sustained, would establish that it may declare by statutes (apart from the constitutional civil service provisions) that in the administration of those institutions, and of its public works and affairs, only the registered electors of a designated party, or only unmarried persons, or only white persons, or Protestants or Catholics, or persons born in this state, shall be employed or appointed, or that certain designated citizens shall not be employed, or that goods or products made or grown by corporations of this state shall not be purchased.  The illustrations might be multiplied.  The state may not, by virtue of its proprietorship, destroy by a statute the right of any person to tender for sale and sell his labor or services, upon such terms as he deems proper, in the construction of public works, or in the administration of public institutions, or the right of a person contracting to construct public works, to buy the labor or employ the person.  The claim of the appellants that the state may with arbitrariness, as an untrammeled proprietor, forbid by statute the employment in the construction of public works of designated persons, or a designated class of persons, is ill-founded, and does not justify the infringement, worked by the section 14, of the personal rights of liberty and property guaranteed to the defendant and the alien class by the State and Federal Constitutions.

The appellants assert further that the section 14 is supportable as a reasonable exercise of the police power of the state — a power inherent in the state, which the state did not surrender when becoming a member of the United States under the Federal Constitution, and which is exercisable for the preservation or promotion of the public health, safety, morals and general welfare or the prevention of fraud or immorality.  While the protec-

tion of the liberty and property of the individual is a main purpose of a government and the Constitution, no person or property is immune from the power of the legislature to impose restraints and burdens upon either as required by the public safety or welfare. The cases are numerous and familiar in which the courts have held that the legislature of the states may, by virtue of the police power, limit the enjoyment or control of property and the right of making contracts. Whenever, however, it is sought to justify or support a statute by invoking the police power, it must appear that it reasonably and fairly tends, in a perceptible and clear degree, towards one or more of the objects of that power; and while it is within the general scope of legislative power to determine whether or not there is, in a given condition, necessity for its exercise, it is within the judicial power and duty to determine whether or not the legislative determination bears any reasonable relation to the public health, safety or morals. Unless such relation exists, the determination must be deemed by the courts arbitrary and unjustified by the police power. (*Health Department of N. Y.* v. *Rector, etc.,* 145 N. Y. 32; *Fisher Co.* v. *Woods,* 187 N. Y. 90; *Lochner* v. *New York,* 198 U. S. 45; *Chicago, B. & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549; *Parks* v. *State,* 159 Ind. 211; *Holden* v. *Hardy,* 169 U. S. 366; *Dobbins* v. *Los Angeles,* 195 U. S. 223; *McLean* v. *Arkansas,* 211 U. S. 539; *Coppage* v. *Kansas,* 236 U. S. 1.) It is argued that the section is within the police power because its natural effect, by interdicting competition from the alien class, increases to citizens the likelihood of employment and increased wages. The argument is both ill-founded and pernicious. The constitutional provisions in question were wisely intended to and do safeguard the liberty and the property of the aliens lawfully residing in the United States. Under and to the extent of these provisions, aliens are on an equal footing with citizens. It

would be unreasonable to assert that the public wel-
fare would be promoted by assuring and compelling unem-
ployment to a class or to classes or to parts of classes of
workers in order that those not banished from the right
of being employed might have fuller employment and
larger compensation. It is argued, too, that there is a
danger or a danger to be apprehended in allowing aliens
to work upon the public works, because they, through
loyalty to the governments to which they owe allegiance,
may destroy or diminish the efficiency or safety of those
works. The argument is insubstantial, and common
knowledge and experience refute it. Persons of unbal-
anced, evil or uncivilized minds do not form a definable
societal class. Each class is infested with them and the
law must deal with them as their acts make necessary.
In the construction of by far the greater part of the pub-
lic works opportunities for the commission of the appre-
hended acts would not exist, and in the alien, as in the
other classes of the state, the number of those who would
commit them is an undiscoverable and insignificant
minority. Obviously, there are civil positions and offices,
and public works of a military, naval or analogous
nature, or periods of conflict in regard to which aliens may,
under the police power, be banned or restrained. Section
14 has not a relation in substance or intent to any of
those positions or conditions, and the state or a munici-
pality may, in the absence of the statute, deny at any
time, and, at least, when conditions justify recourse to
the police power, may by contract bind those contracting
with them to deny employment to members of a danger-
ous group or class. I do not perceive in the arguments
of counsel, or conceive apart from them, any possible
relation of the section to the police power.

The further claim of the appellants that the defendant,
by undertaking the work, waived the guaranty of the
Constitution is not tenable. The transaction between the
city and the defendant was a matter of contract. The

city through specifications and proposals requested bids for their fulfillment and accepted that made by the defendant. If the statute was valid, it incumbered, through legislative power and not through a meeting of the minds of the parties, the contract made; if invalid, it was, as to the defendant, a nullity.

The respondent urges that the section is repugnant to the Federal Constitution as denying to aliens the equal protection of the laws. The primary question in discussing this assertion is, what is the purpose of the statute. The answer manifestly is, as we have already stated, the promotion of the welfare and prosperity of certain wage earners by forbidding the employment in the construction of public works of other wage earners.

The second question is, is the purpose constitutionally lawful. We hold it is not, for the reasons stated, and being thus invalid, no arbitrary classification or discrimination between the laborers of the state effecting the unequal protection of the laws can make it more invalid. If it were valid because the state has the power, arbitrarily and in accord with its unfettered and unbased will, to prohibit the employment of a class in the construction of its public works, by the same token, it has the power, with like paramountcy, to designate the prohibited class, which could not with reason allege a lack of equal protection of the laws. If it were declared valid because within the police power, it could not be declared invalid on the ground that the equal protection of the law to those whom the exercise of that power had lawfully classified and barred had been invaded. Where the purpose of a statute is lawful, the question might arise whether a classification of persons or things, adopted as a part of the prescribed means for effecting it is legal and justifiable. (*Billings* v. *Illinois*, 188 U. S. 97, 102; *Patsone* v. *Pennsylvania*, 232 U. S. 138.)

A review of the relevant decisions will disclose that the courts frequently assume that the " due process of law "

clause is the equivalent of " the equal protection of the laws " clause. In *Holden* v. *Hardy* (169 U. S. 366, 382) the court said: " As the three questions of abridging their immunities, depriving them of their property, and denying them the protection of the laws, are so connected that the authorities upon each are, to a greater or less extent, pertinent to the others, they may properly be considered together." Professor Willoughby writes: " It would seem, however, that the broad interpretation which the prohibition as to ' due process of law ' has received is sufficient to cover very many of the acts which, if committed by the states, might be attacked as denying equal protection. Thus it has been repeatedly declared that enactments of a legislature directed against particular individuals or corporations, or classes of such, without any reasonable ground for selecting them out of the general mass of individuals or corporations, amounts to a denial of due process of law so far as their life, liberty or property is affected." (2 Willoughby on the Constitution, page 874.) Recent decisions verify this statement. (*Coppage* v. *Kansas, supra; Adair* v. *United States*, 208 U. S. 161; *Lochner* v. *New York*, 198 U. S. 45; *Riley* v. *Massachusetts*, 232 U. S. 671; *People* v. *Marcus*, 185 N. Y. 257; *Fisher Co.* v. *Woods*, 187 N. Y. 90; *People* v. *Williams*, 189 N. Y. 131; *City of Chicago* v. *Hulbert*, 205 Ill. 346.) If the " equal protection of the laws " clause be applied, however, it must be held that the attempted classification of the aliens as a prohibited class is unreasonable and arbitrary for the reasons which excluded it from the police power, and for such reasons is unconstitutional and void. (*People* v. *Orange County Road Const. Co.*, 175 N. Y. 84; *Cotting* v. *Kansas City Stock Yards Co.*, 183 U. S. 79; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540; *Southern Ry. Co.* v. *Greene*, 216 U. S. 400; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61; *State ex rel. Richards* v. *Hammer*, 42 N. J. L. 435, 440.)

In view of what has been written, it is not neces-

sary to determine whether or not the section is repugnant to the existing treaty between the United States and Italy.

My conclusion is that the section 14 unconstitutionally attempted to deprive the defendant as the contractor and employer of labor, and the alien class as the vendors of their labor, of liberty and property, and is void.

The judgment should be affirmed.

WILLARD BARTLETT, Ch. J., CHASE, HOGAN, MILLER and SEABURY, JJ., concur with CARDOZO, J. (WILLARD BARTLETT, Ch. J., and SEABURY, J., in separate opinions); COLLIN, J., reads a dissenting opinion for affirmance.

Judgment of Appellate Division reversed and judgment of conviction affirmed.