460

Francisco Ballester Ripoll, Petitioner, *v.* Court of Tax
 Appeals, Respondent; Rafael A. Buscaglia, Treasurer
 of Puerto Rico, Intervener.

No. 1495. Argued February 1, 1943.—Decided March 9, 1943.

J. J. Ortiz Alibrán for petitioner. M. Rodríguez Ramos, Acting Attorney General, and Eulogio Riera, Deputy Attorney General, for intervener.

MR. JUSTICE SNYDER delivered the opinion of the court.

This case is with us for the second time. On a previous occasion, we heard it on certiorari to the Court of Tax Appeals with reference to jurisdictional and procedural questions. 60 P.R.R. 749. It is now here on the merits by virtue of a second writ of certiorari.

On March 15, 1941 petitioner and his wife filed separate income tax returns for the year 1940. Each of them reported a net income of $19,529.45 and paid a tax of approximately $450 so that together they reported $39,058.90 and paid taxes totalling $908.78. Each reported as separate income one-half of the income received from the same sources; viz., (1) salary from a partnership, director's fees from a partnership, and director's fees from a corporation, presumably all for services rendered by the husband alone, and (2) interest on notes payable by a partnership, profits from an interest in a partnership, and corporate dividends.

On August 18, 1941 the Treasurer "reliquidated" petitioner's return, pursuant to Acts Nos. 31 and 159, Laws of Puerto Rico, 1941, by consolidating it with that of his wife and eliminating certain exemptions and credits. Accordingly, the Treasurer notified petitioner he would be required to pay, on the combined net income of $39,058.90, an additional tax of $5,661.71, making a total of $6,570.49, for the year 1940. We granted certiorari to review the decision of the Court of Tax Appeals upholding this action of the Treasurer.

The requirement of a single income tax return by husband and wife is an acutely controversial issue. Feminist organizations in continental United States, pointing out that

today women vote, work, hold office, and help to wage war, have protested vigorously against attempts to obtain Federal legislation requiring a mandatory joint return by husband and wife under the Federal Income Tax Act. They label it as a regressive measure which infringes on the rights of women as individuals and a return to the old common law doctrine that has been breaking down in many other fields of the law that man and wife are one, and that one the husband. Some organizations have opposed the measure as a matter of high principle, asserting it discriminates against decency and invites immorality.

Those who have fought to insert this provision in the Federal Revenue Acts claim that it has no place in a discussion of the emancipation of women. They assert it is simply a product of the academic reality that "The artificial distribution of large incomes among several persons is one of the obvious means of tax avoidance." Bruton, The Taxation of Family Income, 41 Yale L. J. 1172, and that it only brings about "a correspondence between the legal concept and the economic realities of enjoyment or fruition." (*Burnett* v. *Wells*, 289 (U. S. 670, 77). In implementing that argument, Paul gives illustrations of the discriminations allegedly resulting from a provision permitting separate returns by husband and wife from community property states under the Federal Act at the time he wrote. "A resident of New York, for example, with a salary of $100,000 pays $32,525 federal tax, whereas a Californian with exactly the same salary may have one-half reported by his wife so that the *combined* federal tax payable by the two would be only $18,626. . . . Rumors that the virtues of the marriage state commend themselves so highly to the much-publicized residents of Hollywood for reasons other than a storm of uncontrollable emotion may not be entirely unfounded." (Paul, Studies in Federal Taxation, Second Series, footnote 94, pp. 41, 42).

To date the determined effort to obtain such Federal legislation has been successfully resisted. (Mertens, Law of Federal Income Taxation, Temporary Supplement, January 1943, p. 289), although the wall of opposition has been partly breached in estate and kindred taxation. (Secs. 402, 404, and 453 of The Revenue Act of 1942; Comment, The Estate and Gift Tax Amendments: Revenue Act of 1942 Community Property, 31 Calif. L. Rev. 61 (Dec. 1942). . Whatever our private views on this question of the current *mores* may be, the choice among these competing considerations is for the political branches of the government, and not ours. We confine ourselves to decision of the legal issues involved in the choice the Legislature has made.

Section 13 of Act No. 31, Laws of Puerto Rico, 1941, amending §24(*b*) of Act No. 74, Laws of Puerto Rico, 1925, provides that "If a husband and wife living together have a net income for the taxable year of $2,000, or over, or an aggregate gross income for such year of $5,000 or over, the total income of both shall be included in a single joint return, and the normal and additional tax shall be computed on the aggregate income. The net or gross income received by anyone of the spouses shall not be divided between them." The petitioner contends that income for 1940 reported separately by himself and his wife was, under our community property law, owned separately by each of them and that the action of the Treasurer in consolidating their returns by virtue of §13—which resulted in putting their income in a higher tax level—and in demanding additional taxes from him, deprived him of his property without due process of law. He relies on cases of the Supreme Court of the United States interpreting the application of the Federal Income Tax law in community property states and on *Casal* v. *Sancho, Treas.*, 53 P.R.R. 609.

The Supreme Court of the United States, faced in certain states with the problem of fitting the civil law institu-

464

tion of community property into the framework of a Federal income tax statute drawn largely against a common law background, adopted what seemed at the time a pragmatic test—the state law of community property would determine whether the interest of a wife in the income in question was such that she was entitled under the specific terms of the Federal Income Tax Act to file a separate return.

In four consecutive opinions, beginning with *Poe* v. *Seaborn,* 282 U. S. 101, and ending at page 132 of the same volume, the Supreme Court held that if, according to state law in a community property state, a wife had a present vested interest in the community income, and "not a mere expectancy during the marriage" (*Bender* v. *Pfaff,* 282 U. S. 127, 31), she would be considered, for the purposes of Federal income taxation, as the owner of one-half of that income, and was consequently entitled under the terms of the Federal Act to file a separate return from that of her husband, reporting as her separate income one-half of the community income.

It is important to note that *Poe* v. *Seaborn* and its companion cases were grounded on the fact that the Court was called on to interpret the specific language of the Federal Act taxing "the net income of every individual." The Court points out at page 109 that "The Act goes no further, and furnishes no other standard or definition of what constitutes an individual's income. The use of the word 'of' denotes ownership". The result reached was plainly confined to a holding that, once it is ascertained under the community property law of a particular state that the wife's interest in the community income is a vested one, "the spouses are entitled to file separate returns, each treating one-half of the community income as income of each 'of' them as an 'individual' as those words are used in §§210(a) and 211(a) of the Revenue Act of 1925". (*Bender* v. *Pfaff, supra,* at page 152). There was therefore no question involved of the right

of the Federal government to tax such income, if it chose, by the use of more specific language aimed at requiring a joint return by husband and wife, or of the right of a state so to provide in its income tax statute in spite of its own community property rule.

The effort to determine the nature of the wife's interest in community property has produced a prolific volume of legal discussion, which "has fed the flame of juridical controversy for many years." (*Arnett* v. *Reade*, 220 U. S. 311, 19). "Lawyers, like others, must work with categories. It is not strange, therefore, that the community has been compared to a partnership, a trust, an estate by the entirety, an inchoate dower right, and an heir's expectancy. It has been frankly concluded that the wife's interest is *sui generis*, defying common law criteria. As a way out of their difficulties when confronted with something alien to their way of thinking, lawyers and judges, raised on common law terminology, seized upon the concepts of 'vested interest' and 'expectancy', in order to deal with the wife's property right. *In most cases it would have made little difference which of these two concepts was employed in order to describe the wife's interest.*" (Italics ours.) Paul, Federal Estate and Gift Taxation, Vol. I, p. 56.

Indeed, California immediately saw the point. Although it made "little difference which of these two concepts was employed in order to describe the wife's interest"—so far as we are aware, there was no substantial change as a matter of substantive property law—when the Supreme Court denied wives residing in California the privilege of filing separate Federal income tax returns reporting one-half of the community income as their separate income on the ground that, under the community property law as then interpreted by the California courts, the wife's interest was a mere expectancy (*United States* v. *Robbins*, 269 U. S. 315, 27), California promptly passed a statute labeling the wife's

interest vested, and the Supreme Court, in the light of this new statute, just as promptly granted California spouses the privilege of filing separate returns in which the community income was split between them. (*United States* v. *Malcolm,* 282 U. S. 792).

The test would thus seem to be a purely formal one of nomenclature. Its application rarely has any substantial effect on the property rights as such of the spouses. For it to be decisive of such an important and wholly practical problem of income taxation should delight those who canonize conceptualism. Nevertheless, we are constrained by the decision in *Poe* v. *Seaborn* to determine how the government fares under that test in this jurisdiction.

In holding community property liable for a judgment on a promissory note executed by the husband as an accommodation comaker, this court said in *National City Bank* v. *De la Torre,* 54 P.R.R. 219 at pp. 223, 4:

".... The conjugal partnership is a *sui generis* partnership distinct from any other partnership. In it the husband is a manager with such wide and absolute powers that it is rightly said that as regards third parties the partneship and the husband constitute a single entity, a distinction existing only in the relations of the spouses *inter se.* The status of the wife is merely a passive one: ... In other words, the interest of the wife in the conjugal partnership while it exists is a *mere* expectancy or hope to receive one moiety of the liquid assets that might exist when the partnership is dissolved. ... '' (Italics ours).

The Circuit Court of Appeals affirmed this judgment (110 F. (2d) 976; cert. denied, 311 U. S. 666), although it intimated in a comprehensive opinion by Circuit Judge Magruder that it did so only because the judgment of this court on this matter of local law was not "inescapably wrong" (110 F. (2d) at page 983).

In passing on the motion for reconsideration in the *De la Torre* case, this court said that "we do not doubt in reality, that the interest of the wife is something more than a

mere expectancy . . ." (54 P.R.R. 651, 54, 55). In the case before us we are not passing on the nature of the wife's rights as a matter of property law in particular situations. It is therefore not necessary for us in a taxation case of this sort to go further than to say that the wife during coverture does not have a vested right. Just how close to a vested right she may have in particular situations, we may well leave for the future. Saying that "the interest of the wife is something more than a mere expectancy" does not go so far as to call the wife's interest a vested one, and that is the only question before us at this time. See *Ramos González & Co.* v. *Registrar,* 41 P.R.R. 58, 61, 62; McKay on Community Property (1925 ed.) §§835-40, pp. 561-63.

In view of these considerations, we see no escape for the petitioner from the doctrine laid down in *United States* v. *Robbins,* 269 U. S. 315, that income earned by the husband or produced by community property could not be reported for Federal income tax by each filing a return of one-half thereof. This conclusion was reached in 1918 in the Philippine Islands in an opinion by Mr. Justice Malcolm. *Madrigal and Paterno* v. *Rafferty,* 36 Phil. 414. And "The Treasury has ruled . . . that United States citizens residing in Cuba, the Virgin Islands and Spain, may not divide their earned income, since in those jurisdictions the wife's interest in the community property is not vested." Ray, Proposed Changes in Federal Taxation of Community Property: Income Tax, 30 Calif. L. Rev. 397, 402 (1942).

The petitioner contends that a contrary result was reached in *Casal* v. *Sancho, Treas.,* 53 P.R.R. 609. But in that case this court was bound by the specific language of §24(b)(1) of the Income Tax Act as originally enacted in 1925, which permitted separate returns by husband and wife. That Section, as we have seen, has been changed to require a single joint return for incomes in excess of a certain amount. The problem is therefore reduced to determining the validity of the amendatory legislation.

Mr. Justice Holmes with his usual insight pointed out in the *Robbins* case that the alleged unconstitutionality of a provision for a mandatory. single return by husband and wife depends on more fundamental considerations than the imprecise characterizations of "vested interest" or "expectancy". In addition to recognizing that at the time a wife's interest in community property in California was a mere expectancy, Holmes said at pp. 327, 8:

". . . Even if we are wrong as to the law of California and assume that the wife had an interest in the community income that Congress could tax if so minded, it does not follow that Congress could not tax the husband for the whole. Although restricted in the matter of gifts, etc., he alone has the disposition of the fund. . . . That he may be taxed for such a fund seems to us to need no argument. The same and further considerations lead to the conclusion that it was intended to tax him for the whole. For not only should he who has all the power bear the burden, . . . [but] . . . the husband [is] the most obvious target for the shaft . . ."

It was therefore surprising that Holmes joined in *Poe* v. *Seaborn* without raising his voice in protest against the tacit disapproval in that case of the additional reason for the *Robbins* holding which we have just noted. But Holmes came back to this test in his dissenting opinion in *Hoeper* v. *Wisconsin*, 284 U. S. 206. The *Hoeper* case held that a Wisconsin income tax statute which provided for an assessment against a husband of a tax computed on the combined total of his and his wife's income and augmented by surtaxes resulting from the combination, *although under the laws of the state he had no interest in or control over the property or income of his wife*, was violative of due process, because it was an "attempt by a state to measure the tax on one person's property or income by reference to the property or income of another" (p. 215), that is, it was "Taxing one person for the property of another . . ." (p. 218). Mr. Justice Holmes, dissented with whom Mr. Justice Brandeis

and Mr. Justice Stone concurred, saying in part as follows at pp. 219, 20:

"This case cannot be disposed of as an attempt to take one person's property to pay another person's debts. The statutes are the outcome of a thousand years of history. They must be viewed against the background of the earlier rules that husband and wife are one, and that one the husband; and that as the husband took the wife's chattels he was liable for her debts. They form a system with echoes of different moments, none of which is entitled to prevail over the other. The emphasis in other sections on separation of interests cannot make us deaf to the assumption, in the sections quoted, of community when two spouses live together and when usually each would get the benefit of the income of each without inquiry into the source. So far as the Constitution of the United States is concerned, the legislature has power to determine what the consequences of marriage shall be, and as it may provide that the husband shall or shall not have certain rights in his wife's property, and shall or shall not be liable for his wife's debts, it may enact that he shall be liable for taxes on an income that in every probability will make his life easier and help to pay his bills. Taxation may consider not only command over, but actual enjoyment of, the property taxes.

"I will add a few words that seem to me superfluous. It is said that Wisconsin has taken away the former characteristics of the marriage state. But it has said in so many words that it keeps this one. And when the legislature clearly indicates that it means to accomplish a certain result within its power to accomplish, it is our business to supply any formula that the *elegentia juris* may seem to require. *Sexton* v. *Kessler & Co.*, 225 U. S. 90, 97."

The petitioner strenuously asserts that the majority opinion in *Hoeper* v. *Tax Commission* stands in our way in this case. We recently went through a somewhat laborious process to distinguish a United States Supreme Court tax opinion which was shortly thereafter overruled. (Compare *Piacentini* v. *Buscaglia, Treas.*, 59 P.R.R. 764, 777, with *State Tax Comm'n* v. *Aldrich*, 316 U. S. 174). Whether that process will be repeated in the present situation is not for us to say. Impartial commentators of wide repute have ex-

pressed views to that effect. Paul, Studies in Federal Taxation, Second Series, p. 40 *et seq.;* Third Series, p. 178, note 54; Paul, Federal Estate and Gift Taxation, p. 62; Lowndes, Community Income and Alimonies, Texas, Vol. 20, No. 1, p. 3 (January 1942). "The trend of the recent decisions of the Supreme Court is to disregard the refinements of title and to tax income to the person who controls it and derives the actual benefit therefrom. In view of the fact that under the law of the various community property states the husband is given the management and control of the community property, it is not unlikely that the Supreme Court might hold him taxable on the entire community income, thereby in effect overruling the doctrine of *Hoeper* v. *Wisconsin, supra.*" 3 Mertens, Law of Federal Income Taxation, p. 7 (1942).

Certainly recent cases have given increasingly clear danger signals that the rationale of the minority opinion in *Hoeper* v. *Wisconsin* rather than that of the majority opinion now holds sway. Indeed, it can be categorically asserted that the Supreme Court in recent years has in other situations largely abandoned the test of technical ownership which the Court adopted in *Poe* v. *Seaborn.*

Those who espouse the cause of *Poe* v. *Seaborn* rely on the mechanical application of logic, using as the major premise of their syllogism the rule of law that one cannot impose A's tax on B's property, and applying it to the alleged facts, that A and B, although married, have separate vested interests in their community property. Far from decrying logic, we recognize it as an indispensable instrument of the courts. Indeed, for us to ignore its methods at all times would be to chose the path of arbitrary action. But we must, as Holmes has put it, think things, not words. Law is not a "brooding omnipresence in the sky"; its impact on the facts of life is constant. "The life of the law has not been logic; it has been experience" (Holmes, The Common

Law, p. 1). And "a page of history is worth a volume of logic." (Mr. Justice Holmes in *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 49).

As will be presently seen, in cases subsequent to *Poe* v. *Seaborn*, the Supreme Court of the United States has freed itself from the straitjacket of the logic embodied in the sweeping statement that taxation of one person upon the income of another is inhibited. That Court has refused to lose itself in a labyrinth of logic, and, holding firm to the guiding principle that like circumstances should yield like decisions, has pierced the veil of formal ownership to ascertain economic realities in the intensely practical subject of taxation. Surely no one can be heard to complain if in this instance common sense and experience prevail over the syllogism and the doctrinaire concept.

In a variety of recent cases involving gifts (*Helvering* v. *Horst*, 311 U. S. 112), assignments (*Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Eubank*, 311 U. S. 122; *Harrison* v. *Schaffner*, 312 U. S. 579), and trusts (*Corliss* v. *Bowers*, 281 U. S. 376; *Burnett* v. *Wells*, 289 U. S. 670; *Helvering* v. *Clifford*, 309 U. S. 331; *Helvering* v. *Stuart*, 317 U. S. 154, 87 L. ed. 109) the contention was unsuccessfully made that legal ownership is the criterion of taxability. The Supreme Court instead substituted such tests as economic control, solidarity of the family as an economic unit, or even the "satisfaction of his desires" (311 U.S. 112, 117), to justify holding that the income of the property, so disposed of continued to be taxable to the grantor or assignor thereof in spite of the fact that the latter had divested himself of legal title thereto. Mr. Justice Douglas said in *Helvering* v. *Clifford*, 309 U. S. 331, that the income of a trust created by a husband for the benefit of his wife was "at best a temporary reallocation of income within an intimate family group." (p. 335), and that the trust did not "effect any substantial change in his economic position." (Pp. 335, 6).

In the light of these cases, the belief has grown that no constitutional barrier now exists against the taxation of the aggregate income of married couples as a unit, irrespective of questions of technical title thereto, "In view of the overwhelming authority indicating how the Supreme Court would feel on the question were it presented to that tribunal at the present time, there can be little doubt as to the constitutionality of a statutory provision taxing the income of a family as a unit." Ray, Proposed Changes in Federal Taxation of Community Property: Income Tax, 30 Calif. L. Rev. 397, 432. See Paul, Selected Studies in Federal Taxation, Second Series, p. 41; Paul, Federal Estate and Gift Taxation, Vol. 1, pp. 42, 43; Bruton, The Taxation of Family Income, 41 Yale L. J. 1172; Lowndes, *supra*

In any event, to decide the case before us, we need go no further than to point out that *Hoeper* v. *Wisconsin* has left the first ground of decision in *United States* v. *Robbins* unimpaired, and that the major premise underlying the holding in the *Hoeper* case—that the income in question belonged absolutely to the wife—does not, as a matter of local community property law, exist in our case. Indeed, the *Hoeper* case, far from extending the doctrine of *Poe* v. *Seaborn,* was merely an *a fortiori* case thereunder, as the *Hoeper* case arose in Wisconsin, a non-community property state, and the income being taxed was even more clearly the property of the wife than in one of the community property states in which she would have a so-called "vested interest" in one-half of such income.

In examining the facts of our particular case, we note first that, generally speaking, income is the product of capital or labor (§15 of the Income Tax Act, as amended by §7, Act No. 31, Laws of Puerto Rico, 1941). It is not necessary for us to inquire in detail into the various facets of the system of community property as it operates in Puerto Rico (§§1295–1333; §§91–93, Civil Code, 1930 ed.) in order to dis-

pose of the instant case. Without discussing possible exceptions (For a possible example, see §§1267–8, Civil Code, 1930 ed.; cf. *Quiñones* v. *District Court,* 59 P.R.R. 440), in Puerto Rico income received during coverture, whether earned individually or produced by community or separate property, generally speaking, is community income. (Sec. 1301, paragraphs 2 and 3, Civil Code, 1930 ed.). We note parenthetically that there was no departure from this concept of community income in the *Casals* case. In speaking of "separate income" at page 616 of that case, this court was merely referring to the fact that the Legislature had authorized the wife to report one-half of the community income in a separate return. Neither that statutory provision nor the present provision for a single joint return established any rule of property. Each was a method of reporting and calculating taxes and neither added to nor substracted from the substantive property rights as such of the respective parties. Indeed, in requiring a single return by a husband and wife, the Legislature was merely returning to the traditional concept of community property and eliminating the incongruity originally resulting from slavishly copying the Federal statute. "The law of community property is predicated on the unity of husband and wife. The allowance of separate returns is predicated on the separateness of husband and wife." (Altman, Community Property in Peril, 19 Taxes 262, as quoted in Paul, Federal Estate and Gift Taxation, p. 62, footnote 80).

It should be emphasized that we do not undertake in this opinion to lay down detailed rules for fitting property and income in which spouses have an interest into the respective categories of community and separate property. We need go no further than to say that nothing has been called to our attention which would require us under our Code to classify any of the items contained in the returns involved herein as other than community income. To provide for a

joint return under these circumstances is merely to bring income tax law in line with our traditional community property concepts. Only if there were an affirmative showing that one of the spouses had received some separate income in the traditional and technical sense, would we be squarely presented with the problem of determining whether there was any validity left in *Hoeper* v. *Wisconsin* as a controlling authority. Whether the government could argue in that situation that provision for a single joint return was valid on the basis of taxation of husband and wife living together as a single economic unit, we are not called on to decide in this case.

The net result of our extensive examination of this matter is that we have no hesitancy in holding that the provision of §13 of Act No. 31, Laws of Puerto Rico, 1941, for a single joint return by husband and wife is not invalid in its application to the income reported by the petitioner and his wife for 1940.

■ The petitioner contends that the progressive rates provided in §§12 and 13 of the Income Tax Act violate the provision of §2 of our Organic Act (Title 48 U.S.C.A. §737) that "The rule of taxation in Puerto Rico shall be uniform". To support this contention, the petitioner argues that an income tax is a tax on property and is therefore a direct tax, citing *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601. The history of that case, and the intellectual legerdemain required to reach that result, is vivid in the minds of students of this field. Its *ratio decidendi* has fallen by the wayside. "The theory, which once won a qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable . . ." (*Graves* v. *N. Y. Ex Rel. O'Keefe*, 306 U. S. 466, 80). In any event, that contention is wholly irrelevant here, as it involves a problem which is peculiar to the Federal system. This is because the only constitutional requirement which flows from a finding that

a tax is a direct one is that it shall be apportioned according to population (Article 1, §9 of the Constitution of the United States). But that requirement has no reference to insular tax legislation in which it is provided that a tax shall apply in the same manner everywhere within our borders. We therefore obtain no guidance from the effort to label the income tax herein as a direct tax. But that question aside, we still are confronted with the contention that progressive income taxation runs afoul of the uniformity clause of the Organic Act.

In discussing the uniformity requirement found in Article 1, Section 8 of the Constitution of the United States, the Supreme Court pointed out in *Steward Machine Co.* v. *Davis*, 301 U. S. 548, that "If the tax is a direct one, it shall be apportioned according to the census or enumeration. *If it is a duty, impost, or excise, it shall be uniform throughout the United States. Together, these classes include every form of tax appropriate to sovereignty.*" (P. 581; italics ours). "According to the settled doctrine the uniformity exacted is geographical, not intrinsic." (P. 583). "The rule of liability shall be the same in all parts of the United States". (*Florida* v. *Mellon*, 273 U. S. 12, 17). See *Brushaber* v. *Union Pac. R. R.*, 240 U. S. 1, 25.

In construing an insular taxing statute, our Circuit Court of Appeals has said that if "the act applies equally in all parts of Puerto Rico, and all . . . in each class are treated the same . . . the tax is not obnoxious to the uniformity clause . . ." of the Organic Act. (*San Juan Trading Co.* v. *Sancho*, 114 F. (2d) 969, 72). As the statutes involved herein do not provide for different rates of taxation at different places within Puerto Rico but provide only for higher rates at higher income levels, we find no violation of the rule for uniform taxation in §§12 and 13. Most of the cases cited by the petitioner, including *Domenech* v. *Havemeyer*, 49 F. (2d) 849, 52 (C.C.A. 1st, 1931) and *Loíza Sugar Co.*

v. *Domench, Treas.*, 43 P.R.R. 855, have no bearing on this particular problem. We have considered them carefully, but see no purpose in extending this opinion further by distinguishing them in detail.

Section 13 of the Income Tax Act has consistently provided since 1925 that "the term gross income includes... dividends, partnership profits . . . " But §18 thereof provided until recently that "for the purpose of the normal tax only there shall be allowed the following credits: (*a*) The amount received as partnership profits or dividends (1) from a domestic corporation . . . ". Consequently, prior to the passage of Act No. 31, Laws of Puerto Rico, 1941, dividends of a domestic corporation were not personally taxable in the hands of stockholders in calculating the normal tax.

However, §10 of Act No. 31, amending §18 of the Income Tax Act, eliminated the above-quoted credit both for partnership profits and for corporate dividends. It would therefore seem beyond question that such a credit no longer obtains. But the petitioner claims it still exists by virtue of the provision of §5 of Act No. 31, amending §12(*a*) of the Income Tax Act, "Provided, That said normal tax may also be assessed and collected on the income received by shareholders for dividends; . . . " (Italics ours). His argument is that the use of the word "may" in this Section is an attempt to give the Treasurer discretion to impose the tax in question. We agree with petitioner that "the Legislature could not leave to the discretion of the Treasurer the power to impose a tax and . . . a taxpayer is not obliged to pay if the law itself does not impose this obligation upon him". But this new proviso in §12 is mere surplusage. Eliminaiton of corporate dividends from the credit section (§18) rendered them taxable without any further provision therefor. Under those circumstances, the word "may" used in §5 of Act No. 31 obviously meant "must". "A word is not a crystal, transparent and unchanged, it is the skin of a liv-

ing thought and may vary greatly in color and content according to the circumstances and the time in which it is used.'' (*Towne* v. *Eisner*, 245 U. S. 418, 425). See *Sáens* v. *Buscaglia, Treas.* 61 P.R.R. 384, decided February 11, 1943; *People* v. *Avilés*, 54 P.R.R. 257, 64; Crawford, Statutory Construction, par. 262, p. 519.

 The petitioner argues that taxing a stockholder on corporate dividends is invalid because the corporation has already paid taxes on that same income. This contention is frivolous. ''It cannot be doubted that the receipt of dividends from a corporation is an event which may constitutionally be taxed either with or without deductions (citing cases) even though the corporate income which is their source has also been taxed.'' (*Welch* v. *Henry*, 305 U. S. 134 at pp. 143, 4). *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 42; *Lynch* v. *Hornby*, 247 U. S. 339; 1 Mertens, *supra*, §901, p. 411. And see *Hellwich* v. *Hellman*, 276 U. S. 233. *United States* v. *Hudson*, 299 U. S. 498, went even further. Congress levied what the Supreme Court found to be in effect a special 50 per cent income tax on profits realized from transfers of interest in silver bullion. The Supreme Court, in an opinion by Mr. Justice Van Devanter, said at page 500: ''It is not material that such profit is taxed, along with other gains, under the general income tax law, for Congress has power to impose an increased or additional tax if satisfied there is need therefor''.

The petitioner likewise insists that no provision was made in Act No. 31 for the personal taxation of partnership profits after payment thereof to its individual members. Here his argument is that in §5 of Act No. 31, permitting the taxation of corporate dividends, there was no mention of partnership profits. But, as we have seen, this entire proviso is surplasage, and must be ignored. Without reference to §5, it is obvious that under §10 of Act No. 31 no

credit for partnership profits—just as in the case of corporate dividends—exists any longer.

The petitioner then contends that since a partnership under §28 of the Income Tax Act pays a tax on its net income, the members thereof cannot be constitutionally taxed on the same income when distributed to them. But the term "partnership" is not used in our Income Tax Act in the common-law sense. It is a translation of the term "sociedad" found in the civil law. And a *sociedad* is a juridical person apart from the members thereof. *Puerto Rico* v. *Russell & Co.,* 288 U. S. 476. There is therefore no constitutional objection against assimilating a partnership or *sociedad* to a corporation for tax purposes, and taxing both the partnership and its individual members on the same income. *Fantauzzi et al.* v. *Bonner,* 34 P.R.R. 464, 74. To compare our situation with that obtaining under the Federal Income Tax Act as applied to a common-law partnership, which under that Act is not treated as a separate entity, except for accounting purposes, and which therefore pays no tax as such, is to invoke a false analogy. Rabkin and Johnson, The Partnership Under the Federal Tax Laws, 55 Harv. L. Rev. 909, 911–14 (1942).

During 1940 the petitioner was an alien residing in Puerto Rico. He complains that §1 of Act No. 159, Laws of Puerto Rico, 1941, in providing for a higher rate of taxation on the income of a resident alien than on the income of a resident citizen, is violative of the equal protection clause of the Organic Act.

Classification for tax purposes is, of course, permitted. But mere classification in itself is not sufficient—it must not be arbitrary; it must have a reasonable basis (*Cabrero* v. *Sancho, Treas.,* 58 P.R.R. 535, 40). That is not to say that the rule is a rigid one. "The bare fact that the present tax is imposed at different rates and with different deductions from those applied to other types of income does not establish unconstitutionality. It is a commonplace that the equal

protection clause does not require a State to maintain rigid rules of equal taxation, to resort to close distinctions, or to maintain a precise scientific uniformity. Possible differences in tax burdens, not shown to be substantial, or which are based on discrimination not shown to be arbitrary or capricious, do not fall within the constitutional prohibition. *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276, 284, 283, and cases cited.'' (*Welch* v. *Henry, supra* at p. 145). The government contends that under the foregoing test classification for taxation based solely on alienage, resulting in higher taxation for resident aliens than for resident citizens, is proper classification.

It cannot be gainsaid that in many instances the *police power* of the state can be exerted to discriminate against aliens. Thus it has been held that a state may by legislation forbid aliens from (*a*) owning land (*Terrace* v. *Thompson,* 263 U. S. 197), (*b*) obtaining employment in public works (*People* v. *Crane,* 214 N. Y. 154), (*c*) possessing firearms (*Ex Parte Rameriz,* 226 P. 914 (Calif.)), (*d*) operating a billiard parlor (*Clarke* v. *Deckebach,* 274 U. S. 392), (*c*) shooting will game (*Patsone* v. *Pennsylvania,* 232 U. S. 138), or (*f*) practicing law (*Bosque* v. *United States,* 209 U. S. 91). But these cases are all predicated on the theory that the legislation thus discriminating against aliens had some relation to the protection of the public health, safety or morals. The courts, in brief, would not interfere with the legislative judgment that the mere fact of alienage was a sufficient basis on which to bar aliens from activities which either required regulation or which involved a privilege which the state could chose to confer or to deny. The latter alternative was the ground on which the right of the state to exclude aliens from public works was upheld in *People* v. *Crane,* 214 N. Y. 154, 108 N. E. 427, writ of error denied, 239 U. S. 195. But Judge Cardozo, writing the opinion of the court, points out this is based on the fact that the government, in its capacity as a

proprietor, may bar the alien from the right to share in the property which it holds for its own citizens. He then sounds a warning note in the following language in 108 N. E. at p.. 432:

"It must also be evident that nothing in this opinion gives countenance to the view that the government may deny to aliens the right to engage in any private trade or calling on terms of equality with citizens. . . . If the calling is one that the state, in the exercise of its police power, may prohibit either absolutely or conditionally by the exaction of a licence, the fact of alienage may justify a denial of the privilege. . .·. There must, however, be some relation in such cases between the exclusion of the alien and the protection of the public welfare. . . . It *is* a denial of the equal protection of the laws when the government, in its capacity as a lawmaker, regulating, not its own property, but private business, bars the alien from the right to trade and labor. . . ."

Cardozo's language springs from the well settled doctrine that aliens, as well as citizens, are entitled to the equal protection of the laws. "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." (*Yick Wo.* v. *Hopkins,* 118 U. S. 356, 69).

The power to enact laws concerning admission of aliens belongs, of course, to Congress (*Hines* v. *Davidowitz,* 312 U. S. 52). "The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as

chose to offer hospitality." (*Truax* v. *Raich*, 239 U. S. 33, 42, holding invalid a state statute forbidding employment of more than 20 per cent aliens in any occupation).

There is no claim herein that the petitioner engaged in anything but ordinary trade. Under such circumstances, as we have seen, he has our "pledge of the protection of equal laws." For us to declaim this noble rule and then in the next breath to uphold discriminatory taxation on the fruits of such ordinary trade would be for us to make promises held out to aliens under our laws "no more than teasing allusions" (*Ex Parte Kumezo Kawato*, 317 U. S. 69, 87 L. ed. 94).

So far as we have been able to ascertain, no state, nor the Federal government, has ever attempted to impose discriminatory income taxes on resident aliens. Neither party herein has called our attention to any statute involving discrimination in any other type of taxation based solely on alienage. However, our own search has revealed two cases in which the courts struck down such statutes as unconstitutional. A California constitutional amendment imposing upon all adult male aliens an annual poll tax which was not imposed on citizens was held invalid as denying the equal protection of the laws. *Ex Parte Kotta*, 200 P. 957. The court said at p. 958:

". . . Stated very generally, the requirement is for equal protection and security for all, citizens and aliens alike, under like circumstances in the enjoyment of their personnal and civil rights, and in the imposition of burdens, such as penalties, taxes, etc."

For an interesting comment on *Ex parte Kotta*, see 35 Harv. L. Rev. 469. In *Davidowitz* v. *Hines, supra*, in which the judgment of the lower court holding a Pennsylvania statute requiring aliens to register under a state statute invalid was affirmed, an able Circuit Judge said in his opinion in the lower court that the *Davidowitz* case was "almost upon all fours" with *Ex parte Kotta* (30 Fed. Supp. 470, 76).

A Pennsylvania statute imposing a tax of three cents a day for the employment of every adult male alien, and authorizing the employer to deduct the said tax from the wages of such employees, was similarly held invalid as a denial to the aliens involved of the equal protection of the laws in both the Federal and state courts (*Fraser* v. *M'Conway & Torley Co.,* 82 F. 257; *Juniata Limestone Co.* v. *Fagley,* 187 Pa. 193, 40 A. 977).

We see no escape from application to the facts of the instant case of the doctrine laid down in the California and Pennsylvania cases. In attempting to justify the higher rates for resident aliens, the Court of Tax Appeals asserts that they amount to a sort of back payment for all the products of generations of civilization which the alien finds here on arrival and which he proceeds to enjoy without having contributed to the cost thereof. But the Act itself draws no such distinction. The higher rate is imposed on the alien who has resided here many years, and is not imposed on the citizen who has recently arrived. Indeed, for the Act to be so described makes it even more clearly an invasion of the exclusive control of immigration which is vested in the Federal government (*Davidowitz* v. *Hines, supra*). And if the Act, to be consistent with the reasoning of the Court of Tax Appeals, had provided for higher rates of income taxation for citizens of the United States domiciled in Puerto Rico based solely on arrival in Puerto Rico in recent years, presumably it would constitute an improper interference with the unfettered right of citizens of the United States to circulate freely within the territorial limits of the United States (*Edwards* v. *California,* 314 U. S. 160).

It remains only to note that this discrimination against aliens violates not only the equal protection provision of our Organic Act, which is a generic clause, but also the more specific proviso "That the rule of taxation in Puerto Rico shall be uniform". This Act, providing for different rates

within our borders, without any reasonable basis of classification therefor, runs afoul of that clause. *Juniata Limestone Co.* v. *Fagley, supra.*

The Legislature itself has already concluded that the discrimination herein against resident aliens should be abolished, and eliminated it by amending §12 of the Income Tax Act in §3, Act No. 20, Laws of Puerto Rico, Third Special Session, 1942.

Our holding does not, of course, vitiate the entire tax imposed on the petitioner. He is entitled only to uniformity, or equal protection, which means that his tax will be calculated at the same rate as that of resident citizens. *San Juan Trading Co.* v. *Sancho,* 114 F. (2d) 969, 75.

■ The petitioner argues that the Legislature did not intend for the changes in rates and other matters provided in Acts Nos. 31 and 159, Laws of Puerto Rico, 1941, to have retroactive effect as of January 1, 1940. Section 29 of Act No. 31 and §8 of Act No. 159 each provides that "there exists a necessity and an emergency for the retroactivity of this Act, and the same shall take effect ninety days after its approval, which shall take effect ninety days after its approval which shall take effect from and after January 1, 1940." In spite of this provision, the petitioner takes the position that these Acts took effect on January 1, 1941. He bases this contention on a similar provision in a subsequent statute, §11, Act No. 23, Laws of Puerto Rico, 1941, Special Session, enacted on November 21, 1941, providing that it shall take effect retroactively as of January 1, 1941. Insofar as Act No. 23 amends Acts Nos. 31 and 159, Act No. 23, of course, takes effect as of January 1, 1941. But we are unable to follow the petitioner in his contention that the effective date of Act No. 23—January 1, 1941—completely supersedes the effective date fixed in Acts Nos. 31 and 159—January 1, 1940—for the latter Acts.

■ The petitioner next contends that Acts Nos. 31 and 159 of 1941, if applied retroactively to January 1, 1940, are violative of due process. His position in substance is that, once he paid the income taxes on his 1940 income under the law then in force, the Legislature lacked the power to increase such 1940 taxes by a statute enacted in 1941.

The authorities contrary to this contention are overwhelming. The question has been settled since 1873, when the Supreme Court of the United States held valid a statute imposing a tax on all income of a previous year, although one tax on that income had already been paid. *Stockdale* v. *The Insurance Companies,* 87 U. S. (20 Wall.) 323.

Since that date retroactive income tax statutes of varying types have been consistently upheld. (*Welch* v. *Henry,* 305 U. S. 134 (commented on in 52 Harv. L. Rev. 692 (1939)); *Brushaber* v. *Union Pac. R. R.,* 240 U. S. 1; *Copper* v. *United States,* 280 U. S. 409; *Osburn California Corporation* v. *Welch,* 39 F.(2d) 41 (C.C.A. 9th, 1930); *Phipps* v. *Bowers,* 49 F.(2d) 996 (C.C.A. 2nd, 1931); Ballard, Retroactive Federal Taxation, 48 Harv. L. Rev. 592, 597–601; Note, Constitutionality of Retroactive Federal Taxing Statutes, 28 Col. L. Rev. 777; 1 Mertens, Law of Federal Income Taxation (1942), §4.15, p. 154. See dissenting opinion of Mr. Justice Brandeis in *Untermeyer* v. *Anderson,* 276 U. S. at p. 440 *et seq.*). The only cases in which the Supreme Court of the United States has held a taxing statute void for retroactivity did not involve the income tax, and all were close decisions with vigorous dissenting opinions. (*Nichols* v. *Coolidge,* 274 U. S. 531, involving an inheritance tax; *Blodgett* v. *Holden,* 275 U. S. 142, and *Untermeyer* v. *Anderson,* 276 U. S. 440, involving a gift tax). These gift and inheritance tax cases are distinguished in *Welch* v. *Henry, supra,* presently to be discussed. And even within their own field, cf. *Milliken* v. *United States,* 283 U. S. 15, 21, *et seq.*

*Welch* v. *Henry, supra,* involved a 1935 Wisconsin statute taxing corporate dividends received by the taxpayer in 1933, although under the law in force in 1933 such dividends were not taxable (i. e., they were reductible from gross income). The opinion of the Supreme Court, written by Chief Justice Stone, reads in part as follows at pp. 146–50:

"The objection chiefly urged to the taxing statute is that it is a denial of due process of law because in 1935 it imposed a tax on income received in 1933. But a tax is not necessarily unconstitutional because retroactive. *Milliken* v. *United States,* 283 U.S. 15, 21; and cases cited. Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens. Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process, and to challenge the present tax it is not enough to point out that the taxable event, the receipt of income, antedated the statute.

"In the cases in which this Court has held invalid the taxation of gifts made and completely vested before the enactment of the taxing statute, decision was rested on the ground that the nature or amount of the tax could not reasonably have been anticipated by the taxpayer at the time of the particular voluntary act which the statute later made the taxable event. *Nichols* v. *Coolidge,* 274 U.S. 531, 542; *Untermeyer* v. *Anderson,* 276 U.S. 440, 445 (citing *Blodgett* v. *Holden,* 275 U.S. 142, 147); *Coolidge* v. *Long,* 282 U.S. 582. Since, in each of these cases, the donor might freely have chosen to give or not to give, the taxation, after the choice was made, of a gift which he might well have refrained from making had he anticipated the tax, was thought to be so arbitrary and oppresive as to be a denial of due process. But there are other forms of taxation whose retroactive imposition cannot be said to be similarly offensive, because their incidence is not on the voluntary act of the taxpayer. And even a retroactive gift tax has been held valid where the donor was forewarned by the statute books of the possibility of such a levy, *Milliken* v. *United States,* supra. In each case it is neccesary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation.

486

"Property taxes and benefit assessments of real estate, retroactively applied, are not open to the objection successfully urged in the gift cases. See *Wagner* v. *Baltimore*, 239 U.S. 207; *Seattle* v. *Kelleher*, 195 U.S. 351; compare *Citizens National Bank* v. *Kentucky*, 217 U.S. 443, 454; *Billings* v. *United States*, 232 U.S. 261, 282. *Similarly, a tax on the receipt of income is not comparable to a gift tax. We can not assume that stockholders would refuse to receive corporate dividends even if they knew that their receipt would later be subjected to a new tax or to the increase of an old one.* The objection to the present tax is of a different character and is addressed only to the particular inconvenience of the taxpayer in being called upon, after the customary time for levy and payment of the tax has passed, to bear a governmental burden of which it is said he had no warning and which he did not anticipate.

"Assuming that a tax may attempt to reach events so far in the past as to render that objection valid, we think that no such case is presented here. For more than seventy-five years it has been the familiar legislative practice of Congress in the enactment of revenue laws to tax retroactively income or profits received during the year of the session in which the taxing statute is enacted, *and in some instances during the year of the preceding session.* . . . . The contention that the retroactive application of the Revenue Acts is a denial of the due process guaranteed by the Fifth Amendment has been uniformly rejected. . . .

". . . we think that the 'recent transactions' to which this Court has declared a tax law may be retroactively applied, *Cooper* v. *United States,* 280 U.S. 409, 411, must be taken to include the receipt of income during the year of the legislative session preceding that of its enactment." (Italics ours).

The statutes assailed herein meet the test for the validity of retroactive income taxation laid down in *Welch* v. *Henry*. Acts Nos. 31 and 159 were passed in the regular 1941 session, and therefore validly "include [d] the receipt of income during the year of the legislative session preceding that of its enactment [1940]." As in *Welch* v. *Henry* (p. 151), "the legislature in [1941], at the first opportunity after the tax year in which the income was received, made its revision of the tax laws applicable to [1940] income . . .".

The question of retroactive income taxation is not new in this jurisdiction. *Fantauzzi et al.* v. *Bonner,* 34 P.R.R. 464; *Central Eureka* v. *Gallardo,* 39 P.R.R. 311. The *Central Eureka* case held that there was no constitutional inhibition against providing in an insular income tax enacted on August 6, 1925 that it shall take retroactive effect as of January 1, 1924. "The idea of legislation like the present", this Court, through Mr. Justice Wolf, said in the *Central Eureka* case at p. 316, "is that a current tax is to be measured by the income of the previous year." This approach stems from similar language used in *Stockdale* v. *Insurance Companies,* 87 U. S. (20 Wall.) 323, 31 (repeated with approval in *Brushaber* v. *Union Pac. R. R.,* 240 U. S. 1, 20) that "The right of Congress to have imposed this tax by a new statute, although the measure of it was governed by the income of the past year, cannot be doubted; . . . ".

It is interesting to note that "pay-as-you-go" plan for the Federal income tax is now being discussed in Congress, whereby taxpayers will pay 1943 taxes while they are earning 1943's income. In short, the choice of either the *last* or the *present* year as the measure of a tax *presently* being laid is one for the Legislature to make.

At what point the retroactive application of income taxation would amount to taking property without due process, as in other constitutional problems herein, is a question of degree. "In each case it is necessary to consider the nature of the tax and the circumstances in which it is laid . . . " (*Welch* v. *Henry, supra,* at p. 147). The "nature of the tax" here is a tax on income. The "argument frequently made that the course of conduct of the taxpayer might have been different if the statute were in force [at the time the taxpayer acted] can hardly apply to the retroactive income tax". (28 Col. L. Rev., *supra,* at p. 780; matter in brackets ours). And as to the circumstances herein, we have already

seen that the retroactive feature of the statutes in question comes within the rule of *Welch* v. *Henry.*

The case of *People* v. *Graves,* 21 N. E. (2d) 371 (N. Y. 1939), holding invalid a provision of an income tax statute making it retroactive for a period of 16 years, is clearly inapplicable to the facts of the instant case.

 Petitioner claims that even if the retroactive increase of rates found in Acts Nos. 31 and 159 is valid, the attempt in those statutes to tax retroactively items previously exempt and to provide retroactively for a single return for husband and wife is invalid. "Unquestionably Congress has power to condition, limit or deny deductions from gross income in order to arrive at the net that it chooses to tax" (*Helvering* v. *Ind. Life Ins. Co.,* 292 U. S. 371, 81). We see no difference between retroactive removal of such provisions now deemed unwise by the Legislature and retroactive increase in existing rates. The Supreme Court specifically approved such action in *Welch* v. *Henry, supra,* pp. 144, 5, where the exemption of dividends from personal taxation was retroactively eliminated. See also *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 42.

 The constitutional prohibition against "ex post facto laws" embraces only criminal statutes. *Calder* v. *Bull,* 3 Dall. 385 (U. S. 1798). Until the government attempts to invoke the penalties found in the statutes involved herein, there is no occasion to inquire into their alleged retroactive effect.

Alleging that the rates provided in the statutes herein result in his case in a 623 per cent increase in the tax he paid under the previous rates, the petitioner complains that such taxation is confiscatory and therefore deprives him of his property without due process of law. Before embarking on a discussion of this point, it behooves us to delimit the scope of our inquiry. " . . . whether a tax is wise or expedient is the business of the political branches of government, not ours. Considerations relevant to invalidation of

a tax measure are wholly different from those that come into play in justifying disapproval of a tax on the score of political or financial unwisdom." (Mr. Justice Frankfurter concurring in *State Tax Comm'n* v. *Aldrich*, 316 U. S. 174, 84). In making the same point, Holmes illuminated the classic phrase of Marshall when he pointed out that "The power to tax is not the power to destroy while this Court sits." (dissenting opinion, *Penhandle Oil Co.* v. *Knox*, 277 U. S. 218, 23). But it must be emphasized that "this Court sits" to prevent *destruction* by taxation, and not to pass on the wisdom or feasibility or policy involved in tax statutes. *Brushaber* v. *Union Pac. R. R.*, 240 U. S. 1, 24, 25.

Taxation law, both as to statutory interpretation and as to its constitutional phases, has been in a ferment in recent years. The reports of the Supreme Court of the United States are sprinkled with examples of "important shift [s] in constitutional doctrine [in tax cases] . . . after a reconstruction in the membership of the Court." (Mr. Justice Frankfurter concurring in *Graves* v. *N. Y. Ex Rel.* O'Keefe, *supra*, at p. 487). It is no overstatement to say that tax law has become one of the most complex things of this generation. Its operations pervade every day's transactions. It is therefore not surprising that when taxes are discussed, emotion, the foe of objective judgment, is aroused. Such discussions are likely to degenerate into slogans on one side and name-calling on the other—purr words as against snarl words, each with connotations and overtones of wide appeal. But the courts are not the place to resolve such a conflict. We cannot, by the use of advocate adjectives, resort to what has been called epithetical jurisprudence. Nor are we entitled to engage in verbal agility to rationalize our own predilections.

Yet our function, though a limited one, is not performed in a vacuum. When facts are overwhelming enough, even courts may take judicial notice of them, and thereby avoid

in part the criticism of Bentham that the art of Jurisprudence consists of being methodically ignorant of what everybody knows. Without laboring the obvious any further, we address ourselves to determining, not whether the taxes in question were excessive, but whether they were confiscatory.

The statutes assailed here were passed some months prior to the entry of the United States into the present war. But if the Legislature anticipated that our participation in the war was imminent, it cannot now be charged with being a false prophet. And we would truly be methodically ignorant of what everybody knows if we failed to recognize that many sources of insular taxation, including income taxes, have been eliminated or severely curtailed by the impact of the war on the economy of Puerto Rico. Federal import duties as a whole and Federal Internal revenue taxes on rum, by virtue of Federal law, are covered into the Insular Treasury. These revenues, representing a sizeable portion of insular receipts, have dwindled considerably because of the virtual paralysis of shipping to and from Puerto Rico. The same lack of shipping has made severe inroads on the transportation to Puerto Rico of fertilizer to grow sugar cane, and threatens to impair shipment from Puerto Rico of raw sugar, the production of which has been for years the backbone of the economy of Puerto Rico. The flow of excise taxes on automobiles, gasoline, and many necessities of life into the Insular Treasury has dried up due to the interruption of shipment of such products to Puerto Rico. If the Legislature foresaw this dislocation of our economy and sought to cushion its onlaught and to bolster up our finances by imposition of higher income taxes, we are unable to find any justification for substituting our judgment for that of the Legislature as to the necessity or desirability of all or part of these taxes.

But even without reference to the conditions created by war, we need not advert to specific legislation to make the

obvious point that in recent years all governments, whether national or local, have expanded their functions. Taxes have been described by a great jurist as the price we pay for living in a civilized society. With them—Holmes liked to say —we buy civilization. (Paul, Studies in Federal Taxation, Third Series, Preface vi). "Nor is the concept of the general welfare static. Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the Nation. What is critical or urgent changes with the times." (Mr. Justice Cardozo in *Helvering* v. *Davis*, 301 U. S. 619, 41). In brief, whether the increased taxes were born of the exigencies of war, or whether they were required to finance new or expanded functions of government, we see no way in which, short of a finding of confiscation, we can interfere with the legislative judgment in imposing them.

Were the taxes imposed on the petitioner confiscatory? To state the question and the rule of law is delusively simple. To apply it to the facts of a particular case is somewhat more difficult. Here "the decisive distinction are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard . . . is not a rule of law; it is rather a way of life". (*Welch* v. *Helvering*, 290 U. S. 111, 14, 15).

We shall not undertake to break down in detail the 623 per cent increase in income taxes to which the petitioner claims he has been subjected. We note only that the increase does not represent simply higher rates. Much of it flows from the elimination of previous exemptions, credits and privileges already discussed herein and upheld as valid. And he will be relieved of a portion of it by virtue of our ruling that he must be taxed as a resident alien at the same rate as a resident citizen.

It may be conceded that the net result is a startling increase in petitioner's income taxes. But it is difficult for us to see how the petitioner, however excessive he may feel this

taxation to be, can seriously press the contention that the Insular Income Tax Act is confiscatory when it is recalled that it in effect plays the role here which is filled in continental United States by the Federal Income Tax Act, and that our Act to this date has not kept pace with the rates provided in the Federal Act. It may perhaps be argued that comparison of our income tax rates with the Federal rates does not produce a final answer, as other forms of taxation, notably excise taxes, play a larger part here than in the Federal system. The taxpayer might also contend that Federal income taxation has spiraled upward under the pressure of war. But the government might reply that one cannot isolate emergencies in the world of today, and that in the interplay of international, national and insular emergencies a particular taxpayer cannot captiously assert that he alone shall remain unaffected by the expanding and dire needs of government in peace and in war. All this only emphasizes the essential futility of the effort in many cases to strike down tax statutes by episodic litigation. Those who object to what they regard as excessive taxation must under our form of government resort in most instances to the ballot box, not to the courts. "Democracy cannot escape its pressure groups. Each interest has its imperious demands. These groups compete in the market place, in the forums of public opinion, in popular elections, and in our legislative halls, but they have no place in the halls of judicial administration." (Charles Evans Hughes, 18 Proc. of Am. Law Inst. (1941) 24, 29).

Certainly the Legislature which passed these Acts did not on reflection feel that it had overestimated the need for public revenue. At a Special Session in 1942 they provided for further increases in the rates of taxation of which the petitioner now complains (Secs. 3 and 4 of Act No. 20, Laws of Puerto Rico, Third Special Session, 1942, amending §§12 and 13 of the Income Tax Act). And the picture the Legisla-

ture drew of the conditions making the further increase imperative is indeed somber. (Sec. 1—Statement of Motives, Act No. 16, Laws of Puerto Rico, Third Special Session, 1942).

In the light of the host of considerations herein outlined, it would "require a touch of arrogance" (*De la Torre* v. *National City Bank of New York,* 110 F.(2d) 976, 83) for us to assert blandly that an income tax of $6,570.49 (less some reduction resulting from our holding herein eliminating the higher rates for resident aliens) on a net income of $39,058.90 runs afoal of the constitutional inhibition against confiscation and spoliation of property under the guise of exertion of the power to tax.

Lest we be misunderstood, we add that we do not hold nor do we intimate that there is no limit beyond which income taxation cannot go. We hold only that this is a question of degree, and that, under all the recited circumstances, the case before us does not fall on the wrong side of the line (See dissent of Mr. Justice Holmes, *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 41).

The decision of the Court of Tax Appeals will be modified to provide for taxation of the petitioner at the same rate as resident citizens. As thus modified, the decision will be affirmed and the case will be remanded to the Court of Tax Appeals to calculate the tax herein on the said basis.